(102 P.3d 1176)
No. 91,253

IN THE MATTER OF THE EQUALIZATION PROCEEDING OF THE AMOCO PRODUCTION COMPANY FOR THE YEARS 2000 AND 2001 FROM GRANT COUNTY, KANSAS.

Opinion filed December 17, 2004.

*Michael Lennen,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant.

*Douglas P. Campbell,* county attorney, for appellee.

Before MARQUARDT, P.J., HILL and MCANANY, JJ.

HILL, J.: This appeal requires us to determine if the Jayhawk Natural Gas Processing Plant in Grant County has been properly valued for ad valorem tax purposes for the tax years 2000 and 2001. Upon appeal from the county appraiser, the Kansas Board of Tax Appeals (BOTA) approved the values assessed by the county. In its subsequent review, the district court affirmed the BOTA valuations.

We think there is substantial competent evidence that supports all three valuation conclusions for the year 2000, the county's appraised value, BOTA's order, and the district court's subsequent affirmation. Accordingly, we affirm that portion of the court's order determining the year 2000 value. But, because the county merely adopted the same 2000 year value for the 2001 tax year and failed to take any steps to appraise the plant for 2001, the record is devoid of any evidence to support the 2001 value determination. Therefore, we reverse the district court and BOTA's findings for that tax year and remand the case back to the Grant County Appraiser with directions to begin the appraisal process anew for that year.

### Overview

The owner of the Jayhawk Plant, Amoco Production Company, a subsidiary of BP America, (Amoco) completed construction of the plant

in 1998 at a cost of $91,935,251. The plant is a cryogenic gas processing facility that was designed to process 450 million cubic feet (Mmcf) of natural gas per day from proprietary Amoco production and third-party gas wells. Amoco operates approximately 2,000 gas wells in the Hugoton Gas Field.

Natural gas is processed in order to "condition" it for sale and to recover valuable constituents contained within the gas stream. During gas processing at the plant, impurities such as water and nitrogen are removed. Helium and various liquid hydrocarbons, known as natural gas liquids (NGL's), are recovered from the raw gas stream. The processed natural gas, or residue gas, is delivered to the Williams Natural Gas Company's pipeline system (Williams). The Jayhawk Plant also features helium recovery, a process known as nitrogen rejection, and propane product fractionation in order to help local sales of propane. Helium and nitrogen gases from the plant are sold to an industrial gas company, Praxair. The remaining "Y-grade" stream is sent through the MAPCO and Koch pipelines.

Amoco estimates the plant's value was $50,000,000 in 2000 and $38,500,000 in 2001. Grant County assessed its value to be the same as its 1999 value, $70,733,660, for both years 2000 and 2001. The value disagreement was informally appealed to the county appraiser and then formally appealed to BOTA. Obtaining no relief, the matter was taken up by Amoco to Grant District Court.

### Amoco Claims of Error

Amoco's arguments can be grouped into two areas. First, Amoco argues that Grant County, at the BOTA hearing, failed in four respects to meet its burden of supporting its value determination by a preponderance of the evidence. First, it alleges the county's valuation witness, John Cooper, was not an expert. Second, Amoco thinks that the county's appraisal did not meet the generally accepted appraisal standards found in the Uniform Standards of Professional Appraisal Practice (USPAP). Third, Amoco believes the county's valuation failed to follow the statutory definition of fair market value. Fourth, Amoco contends the county presented to BOTA no real evidence, but only speculation, about the future availability of natural gas supplies. The second group of Amoco's

arguments arise because it argues that BOTA was unreasonable and arbitrary when it rejected Amoco's opinion of the plant's value.

In turn then, Amoco contends that the district court erred when it found that the rulings of BOTA were supported by substantial competent evidence and therefore not unreasonable or arbitrary. Amoco also contends that the trial court erred when it ruled that Amoco had failed to sustain its burden in showing a disparity in valuation between the Jayhawk Plant and other nearby gas plants.

## Standards of Review

According to K.S.A. 74-2426(c)(4), review of BOTA orders regarding the valuation of real property for ad valorem tax purposes are heard by the district court of the county where the property is located. On appeal, a district court may not substitute its judgment for that of an administrative tribunal. It is restricted to considering whether, as a matter of law, (1) the administrative agency acted fraudulently, arbitrarily, or capriciously, (2) the agency's administrative order is supported by substantial evidence, and (3) the agency's action was within the scope of that agency's authority. See *Lacy v. Kansas Dental Board,* 274 Kan. 1031, 1040, 58 P.3d 668 (2002). The party who asserts that the agency's decision is invalid, according to K.S.A. 77-621(a)(1), bears the burden of proving the invalidity.

In reviewing a district court's decision reviewing an agency action, we must first determine whether the district court observed all the legal requirements and restrictions placed upon it and then make the same review of the administrative agency's action as the district court. See *Lacy,* 274 Kan. at 1040.

BOTA is a specialized agency that exists to decide taxation and valuation issues. Therefore, its decision should be accorded deference and given great weight. But a reviewing court may take corrective steps if it finds that BOTA's interpretation is erroneous as a matter of law. See *In re Tax Appeal of Family of Eagles, LTD,* 275 Kan. 479, 483, 66 P.3d 858 (2003).

## January 1, 2000, Valuation

The law requires the county appraiser to appraise all taxable real property each year at its fair market value as of January 1, unless

another date is specified by law. (K.S.A. 79-1455.) When a taxpayer challenges BOTA's use of a county's appraisal in assessing the fair market value of property for tax purposes, the reviewing court must determine whether BOTA's valuation was supported by substantial competent evidence and whether BOTA's action was not otherwise unreasonable, arbitrary, or capricious. *In re Tax Appeal of Andrews*, 18 Kan. App. 2d 311, 314, 851 P.2d 1027, *rev. denied* 253 Kan. 859 (1993).

Substantial competent evidence is evidence that possesses something of substance and relevant consequence or furnishes a substantial basis of fact from which issues can reasonably be resolved. *Depew v. NCR Engineering & Manufacturing*, 263 Kan. 15, 26, 947 P.2d 1 (1997). A decision by the Board which is not supported by substantial evidence may be deemed arbitrary or capricious. See *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 710, 79 P.3d 751 (2003). An agency's action is arbitrary and capricious if it is without foundation in fact. *Sokol v. Kansas Dept. of SRS*, 267 Kan. 740, 746, 981 P.2d 1172 (1999). Because a rebuttable presumption of validity attaches to all administrative agency actions, the burden of proving arbitrary and capricious conduct lies with the party challenging the agency's actions. *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 965, 26 P.3d 1246 (2001), *cert. denied* 534 U.S. 1081 (2002).

Amoco argues that Grant County is required by K.S.A. 74-2438 to demonstrate by a preponderance of the evidence the validity and correctness of its valuation of Amoco's industrial property to BOTA. But, according to Amoco it failed in four ways: 1. Cooper, who appraised the plant and testified for the county, was no expert. 2. Cooper's evaluation did not meet USPAP standards. 3. Cooper's work failed to follow the statutory definition of fair market value found in K.S.A. 79-503a. 4. The County gave BOTA incorrect information about the future availability of gas supplies. We examine each claim in order.

## 1. Cooper's Expertise

One of the rules that governs BOTA's actions, K.A.R. 94-2-2 (a), incorporates our Kansas rules of civil procedure. Therefore, K.S.A.

60-456(b) controls the admission of expert testimony here. It provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

A decision to admit expert testimony will not be overturned absent an abuse of discretion. *Irvin v. Smith*, 272 Kan. 112, 125, 31 P.3d 934 (2001). An abuse of discretion must be shown by the party attacking the evidentiary ruling and exists only when no reasonable person would take the view adopted by the factfinder. *Jenkins v. T.S.I. Holdings, Inc.*, 268 Kan. 623, 633-34, 1 P.3d 891 (2000).

Cooper testified he had been a member of the Appraisal Institute since 1974 and that he was certified as a general real property appraiser in both Kansas and Missouri. Employed by the Kansas Department of Revenue Property Valuation Division (PVD) since 1976, Cooper has worked in the areas of oil and gas valuations, commercial and industrial real estate, and special purpose property. From 1979 through 2001, one of Cooper's primary duties has been to oversee the annual update of the PVD oil and gas guide; accordingly, Cooper testified he kept apprized of economic trends in the oil and gas industry. From 1984 through 1991, he completed work associated with the tax equalization of refineries. In addition to appraising the National Helium Plant in 1984, he participated in reviewing an update of the statewide appraisal report in 1996. Also, the county procured Cooper's services under K.S.A. 75-5105a(d), which provides that the director of the PVD is required to assist county appraisers in determining the fair market value of "nonstate assessed properties, the valuation of which requires specialized technical knowledge."

Amoco had the opportunity to voir dire Cooper before the Board in order to disclose any deficiencies in Cooper's ability to testify as an expert witness. In short, it does not appear that BOTA abused its discretion in determining that Cooper was an expert witness for purposes of offering an opinion of the value of the Jayhawk Plant.

Employing our standard of review, we cannot say that no reasonable person would take the view of BOTA here and accept the testimony of Cooper.

## 2. USPAP Compliance

Amoco alleges that Cooper failed not only to correctly employ the recognized technique for appraising gas processing plants, the income approach, but also chose to disregard the approach. Amoco lists "numerous material departures from USPAP" committed by Cooper who basically "disregarded what he admitted were key elements to the income approach."

The Kansas Legislature adopted the USPAP with the enactment of K.S.A. 79-506. Amoco maintains Cooper violated USPAP Standard 1, Standards Rule 1-1(a),1-1(b), 1-2(f), and Standards Rule 1-4(c), as provided below:

"In developing a real property appraisal, an appraiser must identify the problem to be solved and the scope of work necessary to solve the problem, and correctly complete research and analysis necessary to produce a credible appraisal." USPAP Standard 1, Real Property Appraisal Development, Uniform Standards of Professional Appraisal Practice, p. 13 (1999).

"In developing a real property appraisal, an appraiser must:
(a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal;
(b) not commit a substantial error of omission or commission that significantly affects an appraisal." Standards Rule 1-1(a) and (b).

"In developing a real property appraisal, an appraiser must:
. . . .
"(f) identify the scope of work necessary to complete the assignment." Standards Rule 1-2(f), USPAP, p. 15.

"In developing a real property appraisal, an appraiser must collect, verify, and analyze all information applicable to the appraisal problem, given the scope of work identified in accordance with Standards Rule 1-2(f).
. . . .
"(c) When an income approach is applicable, an appraiser must:
    (i) analyze such comparable rental data as are available to estimate the market rental of the property;
    (ii) analyze such comparable operating expense data as are available to estimate the operating expenses of the property;
    (iii) analyze such comparable data as are available to estimate rates of capitalization and/or rates of discount; and

(iv) base projections of future rent and expenses on reasonably clear and appropriate evidence." Standards Rule 1-4, USPAP, p. 16.

Importantly, Standards Rule 1-1 "contains binding requirements from which departure is not permitted." USPAP, p. 13. However, Standards Rule 1-4 "contains specific requirements from which departure is permitted." USPAP, p. 16.

Cooper's 45-page written appraisal included a certification that the "analyses, opinions, and conclusions were developed, and this report prepared, in conformity with the Uniform Standards of Appraisal Practice," and "the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute." Specifically, Cooper's appraisal began with a statement of assumptions and limiting conditions. The report continued with factual data, including identification of the property, statement of ownership, purpose of the appraisal, definition of market value, property rights appraised, identity of the client, intended use of the appraisal, scope of the appraisal work involved, date of appraisal, date of valuation estimate, zoning, history of the property appraised, region description, and a discussion of future production of the Hugoton Gas Field. Cooper's appraisal included a chart of Amoco gas production from the Hugoton Gas Field for 1999 and 2000 and information regarding a proposed gas line. A property description followed, along with information on the plant's manufacturing process and accrued depreciation. Under the analysis section, Cooper included 10 pages of information regarding the gas processing industry, the outlook for natural gas, gas processing statistics for 1995 through 2000, and a review/forecast from 1991 through 2000. After considering the highest and best use of the property, Cooper provided his valuation of the plant after giving consideration to the three approaches to value: sales comparison, cost, and income.

Under the income approach, Cooper disclosed that the information he relied upon was "referenced in Interrogatory No. 20" in addition to that provided to Grant County by the BP Amoco Corporation tax department. Cooper concluded the income approach was not relevant "because of the information limitations." He continued:

"Industry is able to scrutinize income projections . . . because of the availability of proprietary information made so in anticipation of acquiring or disposing such assets. Such information is not available for this report. The information used in the income capitalization approach is not considered as reliable as it should be in this approach. The cost approach is the better indication of value because the plant is new and properly improves the site to its highest and best use, a criteria that is recognized as the best indication of value for special purpose industrial manufacturing properties."

BOTA noted that Cooper had "physically inspected the subject property prior to completion of his appraisal." The district court determined that Cooper was "familiar with and understands the [USPAP]." Cooper testified regarding the requirements of completing an appraisal in compliance with USPAP and detailed actions taken in completing the appraisal report. He further stated that he considered

"the reserve's production decline rates, plant process type, the actual plant performances, its history, and it doesn't have any history to speak of, mechanical state of the plant equipment, and the extent of deferred maintenance, historical operating cost, it has none, contractual arrangement with gas producers we did not have, ownership of the gathering system and the degree of competition from other gatherers and processors, but not the forecasted gas and NGL prices."

We conclude that the record discloses substantial competent evidence that supports the district court's finding that Cooper understood and applied USPAP when completing his valuation on behalf of the county and that any deviations from USPAP found by BOTA were deemed not to be materially detrimental to the opinion rendered by Cooper. We are mindful that this court will uphold findings supported by substantial evidence even if the record could have also supported contrary findings. See *Foos v. Terminix*, 31 Kan. App. 2d 522, 528, 67 P.3d 173 (2003), *aff'd* 277 Kan. 687, 89 P.3d 546 (2004).

### 3. *Use of Statutory Definition of Fair Market Value*

Without specifying which statutory factors Cooper failed to use, Amoco argues that Grant County's valuation did not adhere to the statutory definition of fair market value because Cooper did not correctly perform the income approach, and they add that Cooper's cost approach was flawed. The statute in question, K.S.A. 79-503a,

defines fair market value as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." The statute also provides an extensive list of factors to be considered by county appraisers when determining fair market value.

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

(a) The proper classification of lands and improvements;
(b) the size thereof;
(c) the effect of location on value;
(d) depreciation, including physical deterioration or functional, economic or social obsolescence;
(e) cost of reproduction of improvements;
(f) productivity;
(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;
(h) rental or reasonable rental values;
(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;
(j) restrictions imposed upon the use of real estate by local governing bodies, including zoning and planning boards or commissions; and
(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes. K.S.A. 79-503a.

"The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures which are adaptable to mass appraisal and consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a.

When we examine the record we see that Cooper's appraisal:
- identified the property and provided its size,
- indicated the purpose of the appraisal,
- noted the location of the plant in connection with the Hugoton Gas Field and generally described the Hugoton region,
- indicated the reproduction cost new and allowed for depreciation,
- addressed productivity by including an overview of gas processing production statistics for 1995 through 2000,

- considered the plant's productivity in making adjustments for functional and external obsolescence,
- considered the three approaches to value assessment, cost, income, and sales comparison,
- completed the income approach with the information given him,
- calculated the cost approach for the value of the property, and
- noted any restrictions imposed on the property.

This is substantial competent evidence that supports the district court's finding that Cooper understood that the purpose in completing the appraisal was to estimate the fair market value of the Jayhawk plant in compliance with K.S.A. 79-503a.

Mindful of our duties, we will not weigh evidence at this stage:

" ' "When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances the reviewing court must review the evidence in the light most favorable to the party prevailing below. [Citations omitted.]" ' " *In re Tax Appeal of Colorado Interstate Gas Co.*, 276 Kan. 672, 692, 79 P.3d 770 (2003).

BOTA noted that Cooper acknowledged that the method of valuation most utilized by those in the industry was the income approach if a reliable operating history was available. Ultimately, BOTA agreed that the Jayhawk Plant's income and expense history "was not extensive enough to be probative of the subject property's fair market value." Cooper testified that because the plant was less than 2 years old, with only 1 year of complete operating history available, insufficient income and expenses existed to provide reasonable net incomes which could be capitalized into value. Cooper used historic information and forecasting provided by Amoco's tax representative to the county to arrive at a value of $65,000,000 using this approach. Nevertheless, he did not want to "base my future on using that approach as a final value estimate for this property." Therefore, when correlating the values arrived at by considering the cost and income approaches, Cooper valued the plant at $70,000,000.

In arriving at his value under the cost approach, Cooper looked at the construction costs of various gas processing plants and compared the cost of constructing the Jayhawk Plant with the costs of building the same type of gas plants in the same price range and time span. Cooper arrived at a replacement cost new for the Jayhawk Plant as of January 1, 2000, of $95,670,000 after allowing for inflation. Cooper did not account for any physical depreciation as he estimated the plant to effectively be "new." Cooper allowed a 5% functional obsolescence, while noting that the plant was a state-of-the-art facility, by calculating the difference in percentage between the Jayhawk Plant's throughput for 1999 and the prior year average throughput for Kansas natural gas plants.

Cooper explained that operating capacity is compared to the design capacity when accounting for external/economic obsolescence in manufacturing properties. After allowing 5% for the functional obsolescence, the difference between the plant's 1999 throughput and its design capacity was 23%. Thus, Cooper deducted 23% for external obsolescence. Cooper opined that the throughput of the predecessor plant in the past 5 years had been 85%; therefore, he conceivably could have compared the Jayhawk Plant's 1999 throughput percentage, 73% to 85%, in order to obtain the adjustment for external obsolescence. He stated he gave the taxpayer "the benefit of the doubt" and applied a much greater reduction by comparing the Jayhawk's operating capacity or percentage throughput to its full design capacity.

Even Amoco's expert, Spletter, admitted that while the cost approach is not typically relied on in the industry by willing buyers or sellers, she testified that "within the ad valorem property tax situations, the cost approach is very often looked upon. And if it's done rigorously, it can provide a good indicator of value."

We think, therefore, that substantial competent evidence appears to support BOTA's determination that Cooper's appraisal, which relied on the cost approach, provided credible evidence in support of its valuation. Cooper understood the general importance of the income approach when appraising the Jayhawk plant; however, he explained why he did not deem the income approach to provide a credible value in this case.

### 4. Future Gas Supplies

Amoco forcefully argues that the county provided BOTA with pure speculation about gas reserves in the Hugoton Gas Field and mistaken assumptions about the ability of new vacuum gas recovery operations and a planned new Williams pipeline to increase gas production. Thus, in Amoco's opinion, Cooper's appraisal could not be considered substantial competent evidence. We think that argument misstates Cooper's valuation and fails to take into account testimony from others that was considered by BOTA.

BOTA noted that Amoco and the county disagreed on the remaining life of the Hugoton Gas Field, results from vacuum operations, and the probable impact on natural gas production from a new pipeline. The county's witness, Ronald Cook, a consulting petroleum engineer with 40 years' experience working in the Hugoton Gas Field, testified to BOTA that the Hugoton Gas Field had a 20-year supply of recoverable reserves. Cook's testimony that the field's production had been dropping due to dangerously low pressures was also recounted by BOTA. Furthermore, BOTA acknowledged that engineers provide range estimates from 3 to 12 trillion cubic feet of gas remaining in recoverable reserves in the field. Finally, it noted Cook's testimony that the amount of recoverable reserves may be affected by new drilling technology, such as vacuum operations.

Likewise, BOTA recounted testimony from Steve Ruehle that substantial process modifications would have to be implemented at the Jayhawk Plant once the inlet volume at the plant reached a certain level. Additionally, BOTA noted that "Amoco's Reservoir Engineer," Richard Dixon, testified that Amoco's proprietary wells have continued to decline in production at a rate of 12% annually, even though Amoco employs an aggressive recovery program. Further, BOTA acknowledged that Dixon disagreed with the county's witness, Cook, regarding the impact that vacuum operations would have on the life of the Hugoton Gas Field. Dixon also stated that vacuum operations were not feasible for Amoco's wells. It is clear, therefore, that in arriving at its conclusion, BOTA was not just relying upon the testimony of Cooper.

Cooper pointed out in his testimony that in arriving at his valuation he did rely on some of the information from Cook regarding reservoir engineering and decline in production in the Hugoton Gas Field. Even Amoco, who contended that Cook was not qualified to render an opinion of value regarding a gas processing plant, had no difficulty with Cook's qualifications regarding testimony he offered regarding matters of reserve valuation, decline rates, and rate profiles from the Hugoton Gas Field.

More importantly, Cooper also stated that while he looked at the future supply from the Hugoton Gas Field, his valuation was based more on history. Cooper testified that he included information regarding future pipeline supplies and vacuum operations in the report "solely to indicate that there will be changes in the future, and anybody in business is going to be anticipating changes." Cooper's adjustments for obsolescence under the cost approach were based on Kansas average throughput percentages and the Jayhawk Plant's 1999 throughput. Thus, Amoco's argument that Cooper's appraisal could not constitute substantial competent evidence in support of the county's valuation as it was premised on information regarding the pipeline and vacuum operations is not accurate. Given our standard of review, BOTA's findings are supported by substantial competent evidence.

*Was BOTA's Rejection of Amoco's Value Arbitrary and Unreasonable?*

Amoco believes BOTA acted arbitrarily and capriciously when it rejected Amoco's valuation figures. Our Supreme Court in the case of *In re Tax Appeal of ANR Pipeline Co.,* 276 Kan. 702, 710, 79 P.3d 75 (2003), supplied the framework for making this determination. " 'Arbitrary or capricious' may be established under K.S.A. 77-621(c)(8) where an administrative order is not supported by substantial evidence. [Citation omitted.] 'Substantial evidence is evidence which possesses both relevance and substance so as to form a basis of fact from which issues can be reasonably resolved. [Citations omitted.]' "

Also, in considering the arguments raised by Amoco, we must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the fact-

finder. Conflicting evidence or other inferences are to be disregarded. *Connelly v. Kansas Highway Patrol,* 271 Kan. 944, 965, 26 P.3d 1246 (2001), *cert. denied* 534 U.S. 1081 (2002). Additionally, this court will uphold findings supported by substantial evidence even if the record could have also supported contrary findings. *Ford v. Landoll Corp.,* 28 Kan. App. 2d 1, 2, 11 P.3d 59, *rev. denied* 269 Kan. 932 (2000).

And finally, when we deal with BOTA decisions, because of its expertise, we overturn them rarely. "In order for the court reviewing a decision by BOTA to find a lack of substantial evidence, the decision must be so wide of the mark that it is outside the realm of fair debate." *In re Tax Refund Application of Affiliated Property Services, Inc.,* 19 Kan. App. 2d 247, 250, 870 P.2d 1343 (1993).

Amoco initially argues that its expert's appraisal (by Kathy Spletter) was the only comprehensive USPAP-compliant appraisal evidence submitted to BOTA. It also contends that the income and expense history of the plant was adequate to perform an income approach valuation. Both of these issues have been previously addressed and resolved. However, we will examine BOTA's treatment of Spletter's valuation.

In criticizing the income approach valuation proposed by Spletter, BOTA maintained that "Spletter's discounted cash flow analysis is more indicative of the Taxpayer's present business value than the subject property's fair market value." Also, the Board indicated that the adjustments made in Spletter's appraisal hinged "on the assumption that the subject property's market value is directly related to the amount of gas committed for processing in the plant." BOTA concluded that Amoco had failed to substantiate the alleged direct relationship between gas contracts committed to the subject plant and the subject property's fair market value. The Board also found evidence in the record to suggest that reasons, other than the Hugoton Gas Field's production decline rate, existed to question Amoco's ability to utilize its remaining plant capacity.

Spletter opined that gas processing contracts are fundamental to establishing the value of a gas processing plant as its value depends on its contractual relationships with gas producers. Spletter regarded the three contracts the Jayhawk Plant had in place with

CIG, Oxy, and Mobil to be "market contracts." Because a written processing contract did not exist between Amoco and the Jayhawk Plant, Spletter considered two scenarios for processing the proprietary gas by distributing it to each of the contracts. After considering a full revenue forecast, the expense component, and applying a cap rate, Spletter arrived at values of $38,300,000 and $39,100,000 for the two scenarios.

Cooper testified that he initially requested the county to obtain the gas processing contracts; however, the county failed to request them and Cooper did not make further inquiry. He also testified that while it would have been helpful to have had the contracts, he did not feel it necessary:

"Contracts on an existing gas processing plant amount to encumbrances. They could, they could add value or deduct from value. Therefore, you have to appraise a plant free and clear like an office building. Rents are important but you appraise the property free and clear because those leases may be favorable or disfavorable to the owner. A buyer is going to take that into consideration because they are going to have to live with that long-term. So far as I know ad valorem taxes valuation is based on market value fee simple interest. Like I said yesterday, anything less than fee simple interest is a partial interest in the, in the property, not 100 percent. That's why I didn't consider the fact that we didn't have those contracts that important."

Grant County Appraiser Ann Papay testified that, in her experience, she cannot obtain information regarding gas processing contracts. She stated that the natural gas business is highly competitive and secretive. Further, Papay stated she was never informed by Amoco about the existence "or lack of existence" of third-party gas processing contracts.

Likewise, Cooper opined that most income and operating information for special purpose manufacturing properties is proprietary. For example, Cooper said that he could find market rents, vacancy rents, expenses, and capitalization rates when appraising an office building; however, none of this information was available to the public for a gas processing plant. The highly confidential nature of the gas contracts was reinforced by Amoco's motion seeking a protective order for information regarding the gas processing contracts. A protective order was granted and all proceedings regard-

ing the details of the contracts were held in executive session, and the records of those hearings are considered confidential.

Finally, Amoco complains the district court also made findings concerning the failure of Amoco's expert to value the compression function of the plant and the nitrogen rejection feature. The district court made these observations while reviewing the record in order to determine whether substantial competent evidence existed to support BOTA's decision. In any event, we are able to affirm the district court's judgment even if it relied upon the wrong ground or assigned erroneous reasons for its decision. See *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 118, 936 P.2d 714 (1997).

In conclusion, BOTA noted the statutory provision burdening the county with demonstrating the validity and correctness of its value. In light of the arguments raised by Amoco, it appears that substantial competent evidence supports BOTA's and the district court's findings that the county met its burden of initiating production of "evidence to demonstrate, by a preponderance of the evidence, the validity and correctness of" its valuation of the Jayhawk as of January 1, 2000. See K.S.A. 79-1609; K.S.A. 74-2438.

Although BOTA's affirmation of Cooper's determination not to consider the income approach can be questioned, Cooper did not have all of the income and expense information Amoco had provided to the county, opinion testimony was presented in support of BOTA's findings, and rulings by BOTA in areas of its expertise are presumed valid. After considering the evidence presented by the county and Amoco, BOTA determined that the evidence in support of the county's valuation of $70,733,660 was more persuasive. With our standard of review, we will not alter its judgment.

### Equalized Values With Other Gas Processing Plants

The only testimony on the subject of values of other gas plants was presented by Bernard Hajny, senior tax representative for BP America, called to give testimony on behalf of Amoco. Hajny testified that he prepared an exhibit comparing gas processing plants in Seward, Ellsworth, Kearney, and Grant Counties. Using the appraised values for each of the four plants, Hajny compared the value-to-capacity and the value-to-throughput for each of the fa-

cilities. Hajny said he obtained the current throughputs, and the county assessed valuations for the plants by contacting tax representatives from the other plants. He testified that the $38,500,000 value suggested by Amoco placed the value of the Jayhawk Plant below one of the plants, but higher than the three neighboring plants, based on value-to-capacity and value-to-throughput.

We do not think that limited comparison gives an accurate depiction of fair market value. As stated in *Wirt v. Esrey,* 233 Kan. 300, 321, 662 P.2d 1238 (1983), "[t]here are numerous factors which must be considered in attempting to establish fair market value and basing the valuation on a simple comparison of the tax levies of 'comparable properties' results in an inaccurate calculation." Hajny's chart provided the name of the company which owned each gas processing plant, the county in which the plant was located, the plant's processing capacity, the plant's throughput, and the appraised value. However, Hajny testified that there are many factors to consider regarding the value of a gas plant:

"Q. Okay. And there's no, you make no effort to show the age of each of those plants, do you?
"A. Age is not relevant in this case because in, in all of the analysis that you're going to do they're all competing for the same gas.
"Q. Okay. Let's take, assume that you're a willing buyer and you narrow your purchases down to two plants and both of 'em have throughputs of exactly the same amount and one of 'ems 40 years old and the other one's two years old, would you pay more for the new one?
"A. Not necessarily.
"Q. You wouldn't pay more for the new one?
"A. No, because no two plants are alike. You have to look at what, whether it has fractionation, whether it has a nitrogen rejection unit, whether it has—there's all different kinds of . . . ."

Hajny admitted that he was not qualified to perform a formal appraisal of the Jayhawk plant. Hajny also did not maintain the other properties were appraised using a different method. A party challenging the validity of BOTA's action bears the burden of proving the invalidity. See *Hixon v. Lario Enterprises, Inc.,* 257 Kan. 377, 379, 892 P.2d 507 (1995). In accordance with the rulings in *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs,* 256 Kan. at 426, 446-47, 885 P.2d 1233 (1994), and *Krueger v.*

*Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 705, 71 P.3d 1167 (2003), the district court did not err in determining that Amoco did not sustain its burden of proof and prove the invalidity of BOTA's ruling.

*January 1, 2001, Valuation*

K.S.A. 79-1455 requires the county appraiser to appraise all taxable real property "[e]ach year" at its fair market value as of January 1, in accordance with K.S.A. 79-503a, unless otherwise specified by law. The district court noted "the County Appraiser of Grant County used the same valuation on the gas processing plant as had been established for the year 2000."

Cooper testified the effective date of his appraisal was January 1, 2000. BOTA's findings and conclusions regarding the county's valuation reference information and data associated with the 2000 valuation. When reviewing BOTA's findings for substantial competent evidence, the district court recounted Cooper's appraisal for the plant as of January 1, 2000. Accordingly, the county did not satisfy its burden, pursuant to K.S.A. 79-1609 and K.S.A. 74-2438, to prove by a preponderance of the evidence that the value of the Jayhawk Plant remained $70,733,660 as of January 1, 2001. See *Ortega v. IBP, Inc.*, 255 Kan. 513, 527-28, 874 P.2d 1188 (1994) (preponderance of the evidence is evidence which shows a fact is probably more true than not true). Amoco's argument that the Board's ruling sustaining the county's valuation for 2001 is arbitrary and capricious has merit. See *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989) (arbitrary or capricious conduct may be shown where an administrative order is not supported by substantial evidence; substantial evidence is evidence possessing both relevance and substance, and which furnishes a substantial basis of fact from which the issues can be reasonably resolved).

Furthermore, the effective date of Spletter's appraisal completed for Amoco was January 1, 2000. As indicated in USPAP, the effective date of the appraisal is "[t]he date at which the analyses, opinions, and advice in an appraisal, review, or consulting service apply." Glossary, USPAP, p. 135. Spletter completed her appraisal

and viewed the property in 2000 as well. It does not appear that valuation evidence from Amoco is sufficient to establish a value for the Jayhawk Plant as of January 1, 2001.

Since there is no evidence in the record to support BOTA's findings or the district court's review, we must remand the matter to the Grant County appraiser for the appraisal to begin anew for the year 2001.

Affirmed in part, reversed in part, and remanded with directions.