NOT DESIGNATED FOR PUBLICATION

No. 126,290

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal for the
CITY OF COUNCIL GROVE,
for the Tax Years 2014, 2015, and 2016.

MEMORANDUM OPINION

Appeal from Board of Tax Appeals. Submitted without oral argument. Opinion filed March 27, 2026. Affirmed.

*Linda Terrill*, of Property Tax Law Group, LLC, of Overland Park, for appellant City of Council Grove.

*Michael A. Montoya*, of Michael A. Montoya, P.A., of Salina, for appellee Morris County.

Before PICKERING, P.J., CLINE, J., and CAREY L. HIPP, District Judge, assigned.

CLINE, J.: The City of Council Grove appealed the property tax valuation of City-owned land surrounding Council Grove Lake that is subject to long-term residential leases. The appraiser hired by Morris County found the lease rent to be below market value, so he did not base his appraisal on it. The Board of Tax Appeals (BOTA) agreed with this approach, only making minor adjustments. We remanded the valuation approved by BOTA with directions for BOTA and the appraiser to explain what weight was given to the lease rent in determining the appraised value of the land or explain why little weight was given to the lease rent. *In re Tax Appeal of City of Council Grove*, No. 121,005, 2020 WL 3394453, at *7 (Kan. App. 2020) (unpublished opinion).

1

The case now returns to our court for determination of whether BOTA complied with our remand instructions.

Upon review of the record, we find the appraiser and BOTA complied with our instructions. At the evidentiary hearing on remand and in BOTA's order on remand, the appraiser and BOTA explained why little weight was given to the lease rent in determining the appraised value of the land. We are unpersuaded by the City's claim that the appraiser and BOTA's valuation of the land violates Kansas law and therefore affirm BOTA's order on remand.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves the property tax appraisal of improved land surrounding the Lake for the years 2014 through 2016. The Lake, which is a source of water for the City, and the land surrounding it, is owned by the City. The City leases the land to individuals (Homeowners) under a form lease agreement that this court has previously noted is "unique and may be the only one in the State of Kansas." *In re Tax Appeal of City of Council Grove*, No. 116,414, 2017 WL 3669088, at *1 (Kan. App. 2017) (unpublished opinion). There are 350 leased lots for permanent and part-time residences, five public park areas, boat ramps, and common areas on the land.

The relevant portions of the lease agreement that each Homeowner signed required the Homeowners to pay the City $1,200 per year in lease rent for the years at issue in this appeal. The lease provides that the City may increase rent only under certain circumstances, such as a significant increase in expenses. The initial lease term was 30 years, but it automatically renews for successive 30-year terms. Homeowners may devise their interest in the lease or transfer it with prior approval by the City.

Homeowners are responsible for all taxes on the leased land, including taxes assessed by the County against the improvements which are separate from the land.

The form lease was drafted by the Council Grove City Lake Association in 2008. At the time, the City's mayor advocated for charging $2,500 per lease. According to one of the Homeowners, Dave Fritchen, "everyone went ballistic" over the proposed lease amount. Thus, a committee was formed to address the lease rate, with members from local businesses, Lake residents, individuals from each ward (including Fritchen), and the city council. Fritchen noted that the committee did not seek "a fair market rent, but part of the purpose of bringing us together was the leaseholders around there were concerned about rent stability." Fritchen also agreed that "the impetus behind all this movement was to get the taxes down because they were going too high."

The County hired Tim Keller with Keller, Craig & Associates to appraise the land to determine its fair market value for the tax years 2014, 2015, and 2016. Keller prepared an appraisal report for each of those years. The fair market value of the land is used to determine the amount of ad valorem tax the City is required to pay. See K.S.A. 79-1439.

In Keller's appraisal, he did not use a cost approach analysis to determine the fair market value of the land because it would be the least reliable analysis "due to the age of the property and current market conditions." Instead, Keller applied an income approach to determine the fair market value. No one challenges Keller's decision to take this approach to valuing the land. Rather, the City contends Keller erred by using "market rent" instead of the actual lease rent the Homeowners pay the City.

According to Keller's appraisal:

"Market rent is defined as the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified

lease agreement including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term concessions, renewal and purchase options, and tenant improvements."

Because of the low amount paid through the current lease, Keller considered three lake land leases in the Midwest. When comparing the Lake to the other properties, Keller considered the waterfront, water view, presence of boat docks, occupancy period, lot size, and lake size. Keller's appraisal acknowledged that the characteristics in the locations differed and adjusted the valuations accordingly. For example, two of the comparable properties had an inferior waterfront when compared to the Lake properties. Keller adjusted their rent by increasing the rent by 100% to account for the difference. But those same two properties had a larger lake, so he reduced their rent by 30% to account for the different lake sizes.

Given his calculations, Keller estimated that an annual rent between $4,150 and $5,600 was appropriate. His report settled on $5,500 annually based on "the amenities that are available such as year round availability and large sites that support permanent structures."

Keller made several adjustments to this amount, including calculating the net operating income and then applying a 7% capitalization rate to that amount. He also used a discounted cash flow analysis to determine a second market value for the land.

Using the market values derived from the two income approaches, Keller determined that the market value of the land for tax year 2014 was $24,000,000. Using the same methods, Keller determined that the market value of the land for tax year 2015 was $25,000,000, and, for tax year 2016, it was $26,000,000.

The County assessed taxes against the City using Keller's appraised fair market values. The City appealed that valuation to BOTA. It argued that the County's appraisal failed to comply with K.S.A. 79-503a, which sets standards for determining fair market value of real property including the consideration of government imposed restrictions. BOTA heard evidence and arguments on the valuation from the parties in May 2018. BOTA generally accepted Keller's appraisal, with some modification based on different adjustments it found were necessary. BOTA ultimately determined appraised values of the land as follows: $16,581,000 in 2014, $17,579,000 in 2015, and $17,657,000 in 2016.

The City then appealed BOTA's decision to this court. We reversed BOTA's decision on the valuation of the land and remanded the case to BOTA after finding Keller and BOTA failed to address the lease rent. In explaining our decision, we said:

> "BOTA did not adequately address Keller's failure in its full and complete opinion. In short, the governing statutes require that the actual rents be considered in arriving at the fair market value of real property. Neither Keller nor BOTA appears to have done so. The law does not mandate that the stated rents are necessarily controlling. But we would expect an appraiser and the reviewing administrative agency to acknowledge those rental amounts and to explain what weight they have been given in arriving at a tax valuation and, especially if they have been given little weight, why. . . . See K.S.A. 79-503a." *In re Tax Appeal of City of Council Grove*, 2020 WL 3394453, at *7.

The case was returned to BOTA with instructions for the lease rent to be considered "'in connection with cost, income, and other factors'" to determine the fair market value of the land. 2020 WL 3394453, at *7 (quoting K.S.A. 79-503a).

5

*Consideration of Contract Rent on Remand*

BOTA held an evidentiary hearing on remand in May 2021. Keller testified about how he considered the lease rental rates in determining the fair market value of the land:

"Q. In your appraisal report, can you describe to [BOTA] how you address the ground lease in valuing this property?

"A. So lease terms were considered, I looked at the ground lease, in fact, I summarized some of the terms in my appraisal report and included a copy of the contract, the lease, in my appraisal. And because I didn't think it was a market-derived transaction, I did not consider it in my cash flow projections. I did not use the contract rent in my cash flow projections, I ignored them, I used instead a market rent that I derived in my report based on analysis of other competing properties and sales.

"Q. So when you say that you ignored it, could you explain what that word 'ignored' means?

"A. Yes, so in preparation of this report, I didn't use the contract rent; I didn't use the rent that's specified in the contract. I used what I thought was market rent.

"Q. Why didn't you believe that the rent in the contract represented market rent?

"A. Well, it didn't meet the—it didn't meet the—kind of my test, or the test that we use as appraisers. When you try to consider whether or not a transaction is a market-based transaction, you look at several things about the transaction. And you look at the transaction itself and wonder if there's some issues there that are not typical to market. You also look at the terms of the lease in terms of how they were developed. And it's not unusual in our business to be provided with leases that maybe don't meet that same test of a willing buyer/willing seller and the other things that are in our statute when it comes to market value.

". . . There was no conversation about how to derive the rent, there wasn't any market studies that were done, it was, for a lack of a better word, a political decision that was—the negotiation was between members of the city counsel and property owners that live out there, some of which, are probably voters. But because of those things, I didn't think the lease was a market rent transaction.

"And, like I say, this is something that we oftentimes run into when we might have a family-related lease between party members. We get a copy of that when we're

6

doing our assignment, we don't necessarily rely upon that when we're trying to come up with what we think is a fair market value."

BOTA then explained in its order:

"It is clear from Keller's testimony both at the original hearing and at the hearing after remand that he concluded the contract leas[e] rates on each Council Grove Lake lot were below market. [BOTA] finds no basis in the record to disagree with Keller's conclusion on this point, particularly in light of specific testimony from individuals directly involved with the process that the contract rates were negotiated not to reflect the market for similar lease lots, but to achieve rent stability, prevent the city from raising rental rates on the lots, and keep the real estate taxes on the lots low. *See* County Brief on Remand, p. 11-13. Keller's testimony establishes that he was clearly aware of the perpetual lease contracts in place on all of the Council Grove Lake lots but disregarded the actual contract rate in his analysis, because he did not find it to be indicative of the market rate that he was required to apply utilizing generally accepted appraisal principles. Keller's approach here was, on its face, consistent with both the Appraisal Institute's directive that an appraiser conducting an income approach analysis to determine a property's fee simple value should use market rental rates, rather than contract rental rates, and with Kansas law requiring valuation of a fee simple estate, rather than a leased fee. *See* ARE, at 420; K.S.A[.] 74-2433(g)."

Thus, BOTA ultimately did not change its opinion that Keller's valuation using higher rental rates than the $1,200 in the lease was appropriate. The City moved for reconsideration, which BOTA denied, and then it appealed.

REVIEW OF THE CITY'S APPELLATE CHALLENGE

The City argues that Keller erred in appraising the land when he "ignored" that the City and Homeowners have a perpetual lease in place which limits the rent that the Homeowners pay. The City also asserts that BOTA erred in maintaining its original

7

conclusion, because it contends K.S.A. 79-503a requires BOTA to use the lease rent when determining the fair market value of the land.

The County, for its part, argues that this court did not require the lease rent to be used when appraising the land, but simply ordered that there must be a complete explanation of the role that the lease rent played in the appraisal to comply with K.S.A. 79-503a.

*Standard of Review*

The Kansas Judicial Review Act, K.S.A. 77-601 et seq., governs appellate review of BOTA's rulings. K.S.A. 74-2426(c); K.S.A. 77-603(a). When determining the validity of an assessment of the valuation of real property for uniformity and equality in the distribution of taxation burdens, the essential question is whether the standards prescribed in K.S.A. 79-503a have been considered and applied by taxing officials. *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 649, 333 P.3d 899 (2014); *Krueger v. Board of Woodson County Comm'rs*, 31 Kan. App. 2d 698, 702, 71 P.3d 1167 (2003), *aff'd* 277 Kan. 486, 85 P.3d 686 (2004). Because the City is challenging BOTA's action, the City bears the burden of proving the invalidity of the action. See K.S.A. 77-621(a)(1).

To the extent this issue involves statutory interpretation, this court's review is unlimited. *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022). But when construing tax statutes, provisions which impose a tax are to be construed strictly in favor of the taxpayer. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017).

*Ad Valorem Taxation*

Unless specifically exempted, all real and tangible personal property in Kansas is subject to taxation on a uniform and equal basis. Kan. Const. art. 11, § 1(a); K.S.A. 79-101. The Legislature enacted a statutory scheme to ensure property is appraised in a uniform and equal manner for ad valorem tax purposes. A central component of this statutory scheme is the requirement that property be appraised "at its fair market value as of January 1 in accordance with K.S.A. 79-503a unless otherwise specified by law." K.S.A. 79-1455.

Fair market value for ad valorem tax purposes has been defined as "'[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 130, 275 P.3d 56 (2012), *abrogated on other grounds by In re Equalization Appeal of Walmart Stores, Inc.*, 316 Kan. 32, 513 P.3d 457 (2022); see also *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004) (holding Kansas ad valorem valuation contemplates valuation of the fee simple interest).

"Kansas tax statutes do not use the term 'fee simple'; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property in an open and competitive market*, assuming that the parties are acting without undue compulsion.' (Emphasis added.) It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d at 130-31.

9

This definition requires all rights and privileges in real property to be valued. But "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

Fair market value is the key to determining a value for the hypothetical sale. K.S.A. 79-503a provides:

> "'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

Additionally, K.S.A. 79-503a contains a list of nonexclusive factors to provide guidance on the methods that may be used to determine fair market value:

> "Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:
> (a) The proper classification of lands and improvements;
> (b) the size thereof;
> (c) the effect of location on value;
> (d) depreciation, including physical deterioration or functional, economic or social obsolescence;
> (e) cost of reproduction of improvements;
> (f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;
> (g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

And here the City appears to agree. Instead, it raises a different issue on appeal. While the City acknowledges that both Keller and BOTA provided an explanation for their decisions, it claims the failure to consider the lease rent violates Kansas law.

Appraisals for ad valorem taxation purposes must comply with the Uniform Standards of Professional Appraisal Practice (USPAP). K.S.A. 79-506(a). In addition, the ad valorem appraisal process must "conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." K.S.A. 79-503a. Whether an appraisal complies with USPAP, as required by K.S.A. 79-503a and K.S.A. 79-506(a), is an issue of law subject to de novo review. See *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 885, 891-92, 221 P.3d 598 (2009).

*Explanation of Lease Rent on Remand*

At the evidentiary hearing on remand, Keller explained why he did not use the lease rent when valuing the land. He said the lease rent did not reflect the actual value of

11

the land because it did not meet the test that appraisers use when determining fair market value. Instead, he compared the lease rent to a below-market transaction like a lease between family members because he does not necessarily rely on a family-related lease when determining fair market value either.

When addressing why it found Keller's assessment and methodology appropriate, BOTA pointed out that in the original hearing individuals directly involved in determining the lease rent testified that the rates were not negotiated to reflect market value for the land. The rates were negotiated for other reasons, including to "keep the real estate taxes on the lots low." It also pointed out that Keller addressed why he gave little weight to the lease rent, and it found Keller's reasoning was "consistent with both the Appraisal Institute's directive that an appraiser conducting an income approach analysis to determine a property's fee simple value should use market rental rates, rather than contract rental rates, and with Kansas law requiring valuation of a fee simple estate, rather than a leased fee."

We find both Keller and BOTA adequately explained their decisions not to rely on the lease rent in determining the fair market value of the land. Thus, we find they complied with this court's mandate.

*K.S.A. 79-503a does not require lease rent be used in appraisals.*

The City raises another issue with the appraiser's and BOTA's valuation of the land. It argues that K.S.A. 79-503a(f), (h), and (j) mandate that the lease rent be used to determine fair market value of the land. It contends that the lease rent agreed upon constitutes a restriction imposed by the state or federal government and local governing bodies as defined in K.S.A. 79-503a(f),(h), and (j). As a result, it claims Keller was not

12

free to ignore the lease rent but was, instead, required to use it because the City contends the lease is a restriction imposed by the local governing body.

The City relies on *In re Equalization Appeal of Ottawa Housing Ass'n*, 27 Kan. App. 2d 1008, 10 P.3d 777 (2000), to assert that "fee simple value for properties with rents 'restricted by . . . local governing bodies' utilizes the contract rental rate, not the market rental rate in the income approach to valuation." Yet this case does not mandate the use of contract rent imposed by local governing bodies in the appraisal of a property, but rather that it at least be considered. In that case, we held that

> "a low-income housing contract is an investment tool for maximizing an investment in real estate. Buyers and sellers of real estate consider these tools in determining the market value of real estate. This principle corresponds with the Kansas definition of 'fair market value' as 'the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion.' [Citations omitted.]" 27 Kan. App. 2d at 1013.

Thus, in the same way a buyer would consider the restrictions on the property in creating a purchase offer, the appraiser will consider the restrictions and determine whether they affect the appraisal.

Similarly, when we remanded this case to BOTA, we said: "The law does not mandate that the [lease rent rates] are necessarily controlling." *In re Tax Appeal of City of Council Grove*, 2020 WL 3394453, at *7. We simply held that K.S.A. 79-503a requires that they be considered and that Keller and BOTA must explain how and why the lease rent rates were or were not used in reaching their conclusions. 2020 WL 3394453, at *7.

BOTA explained why this situation is not a restriction imposed by the state or federal government and local governing bodies as defined in K.S.A. 79-503a(f), (h), and

(j), which provide as an example "restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986." K.S.A. 79-503a(f), (h), and (j). It noted:

> "[BOTA] notes that those two provisions of K.S.A. 79-503a specifically referenc[e] restrictions placed upon property that qualifies for low-income housing under section 42. Those restrictions notably have the effect of *decreasing* a property's market value, which is then offset by tax credits or other means to entice developers to pursue this type of property development. The relationship between the incentives to build low-income housing and the restrictions associated with receipt of those incentives ensure that this type of property is ultimately used for its intended purpose."

Thus, the owner of property limited by section 42 restrictions is either still assessed the full taxes and receives tax credits as a result of complying with section 42, or received monetary support in constructing a facility that would allow for low income housing in lieu of any other opportunity that could be potentially more lucrative and thus create a higher property value. These avenues create either a limitation on the earning potential or value of the property, as it is restricted in exchange for a benefit.

Keller addressed this argument as well, when he noted that there are times when there is a contract rent that does not comport with the fair market rental value of the property. In those scenarios, he explained that he would not use the contract rent as it would decrease the tax burden based on an independent agreement. For instance, Keller referenced situations where a property owner rents their property to a family member for a low rate. The contract rent could be substantially lower than the fair market value of renting a comparable property; however, it does not change the value of the property and the owner is still liable for the taxes on the full value. The owner elected to take a fraction of the earning value, in exchange for the benefit of their relative being the lessee. Here, the relationship between the City and the Homeowners is more like the family and friends discount given by one relative to another.

Unlike the scenario of a private individual leasing their property to a family member for a fraction of the fair market rent, here the lessee is responsible for the taxes. The Homeowners argue that because they do not own the land but rather have the right to occupy the land with some restrictions, the value should be limited to the income approach appraisal that considers the lease rent. But "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, Syl. ¶ 6.

The lease gives the Homeowner basically complete control over the land to the exclusion of others, and beyond an ordinary lessor/lessee relationship, the Homeowners can "encumber by mortgage or deed of trust, or other proper instrument, its leasehold interest and estate in the Lease Premises" as well as "sell, transfer, assign, gift, devise by will or other instrument, its interest in this Lease." In fact, at the first BOTA hearing, the mayor of Council Grove, who was on the city council at the time of formation of the lease, confirmed that it would be "a fair statement to say that the real idea of this lease agreement was to give the tenants full and complete control over this property while, at the same time, not really saying that they own it." Therefore, we do not find the fact that the Homeowners bear the responsibility for payment of real estate taxes on the land requires use of the lease rent to determine fair market value.

Apportioning value based on the Homeowners' lease rent would give the Homeowners a tax windfall as compared to other Council Grove landowners or lessees who own or lease land not adjacent to the Lake. We do not believe this result is required by K.S.A. 79-503a. And the lease here does not provide a benefit or detriment to either side sufficient to fulfill the types of governmental restrictions referenced in K.S.A. 79-503a(f), (h), and (j). The Homeowners are enjoying the full right to occupy and use City property to the exclusion of others, and the rent they agreed to pay to the City does not reduce the fair market value of the property.

CONCLUSION

Pursuant to the remand instructions in *In re Tax Appeal of City of Council Grove*, 2020 WL 3394453, BOTA and Keller properly explained what role the lease rent played in determining the value of the land. And we do not find that Keller's appraisal methodology or BOTA's valuation violate Kansas law. We therefore affirm BOTA's valuation order on remand.

Affirmed.