NOT DESIGNATED FOR PUBLICATION

No. 119,683

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeals of
KANSAS CVS PHARMACY, L.L.C., et al.,
for the Years 2015 and 2016 in Johnson County, Kansas.

MEMORANDUM OPINION

Appeal from the Board of Tax Appeals. Opinion filed October 22, 2021. Affirmed.

*Kathryn D. Myers*, assistant county counselor, for appellant/cross-appellee Johnson County Board of County Commissioners.

*Darcy Demetre Hill*, of Property Tax Law Group, LLC, of Overland Park, for appellee/cross-appellant Kansas CVS Pharmacy, L.L.C.

Before BRUNS, P.J., GARDNER and CLINE, JJ.

GARDNER, J.: This judicial review action asks us to revisit the unanimous decision of the Board of Tax Appeals (BOTA) that established the ad valorem taxation for tax years 2015 and 2016 of real properties leased by Kansas CVS Pharmacy, L.L.C. (CVS). After receiving the Board of Johnson County Commissioners' appraised values of the properties, CVS appealed to BOTA. After an evidentiary hearing, BOTA lowered the valuations on each of the properties and ordered Johnson County to refund CVS for any overpayment made for the 2015 and 2016 tax years. Neither party is content with BOTA's ruling as both petitioned for judicial review.

1

The County contends primarily that BOTA erred by following *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 275 P.3d 56 (2012), and by adopting the methodology of CVS's expert who relied on *Prieb*. *Prieb* found that build-to-suit leases cannot be used to determine the fair market value of properties without disentangling the contract rights from the property value. CVS's expert witness valued the properties without relying on build-to-suit leases. BOTA determined that CVS's proposed valuations were more consistent with Kansas law and based its valuations on CVS's expert witness' appraisals of a hypothetical leased fee estate.

CVS's cross-petition argues that *Prieb* is valid law but it requires valuations to be of a fee simple estate, rather than of the hypothetical leased fee that BOTA adopted. For the reasons set forth in this opinion, we find no error in BOTA's decision. Thus, we affirm.

*Factual and Procedural Background*

In June 2017, BOTA held a consolidated hearing to hear expert witness testimony in several tax cases. Both tax years 2015 and 2016 and all CVS properties were combined in one evidentiary hearing.

At that hearing, experts for the County and for CVS agreed on some basics:

- Kansas law requires appraisers to value real estate in fee simple for ad valorem tax purposes;
- appraisals must be done in accordance with generally accepted appraisal standards and the Uniform Standards of Professional Appraisal Practice (USPAP);
- the income approach best indicates the values here; and

- market rents rather than contract rents should be used in the income approach.

Still, the experts relied on different methodologies in valuing the properties. Their primary point of disagreement is whether the big-box build-to-suit properties such as those leased by CVS are their own market.

*The County's Expert Testimony*

At the hearing, Tim Keller, MAI, of Keller, Craig & Associates, testified about a capitalization rate study he did for Johnson County in 2015 and 2016. Keller explained that when starting a capitalization rate study, he looks to all the sales in the county and sorts them based on whether the property was occupied and leased and if they were bought mainly for the property's income potential. Then he verifies the sales price and the income and expense information on the sale. If he is unable to verify the sale information, he omits that sale from the study. He uses only data from arm's-length transactions. He found the highest and best use for the properties was its current use as a convenience/pharmacy store.

Keller explained that as to build-to-suit leases, the first tenant is the first-generation user and any later tenants are second-generation users. Keller testified that the Appraisal Institute, which publishes The Appraisal of Real Estate and *The Appraisal Journal*, do not state that build-to-suit leases cannot be used to determine market rent. Keller testified that The Appraisal of Real Estate is a reliable and authoritative source for appraisal practices and that the 14th edition was the most recent version. But Keller testified that *The Appraisal Journal*, which he described as a "forum for authors in the evaluation field," was not an authoritative source for generally accepted appraisal practices.

3

Keller explained that if he were looking at a building that was built for a particular tenant and then sold by the landlord to a third party, he did not make any adjustments for the price of the property because "the rent has been determined between the tenant and the landlord" and the third-party sale was unrelated to the rental agreement. Keller testified that his capitalization rate study contained no adjustments for property rights, tenant improvements, or similar items.

At a second hearing about CVS properties, Tiffany Osborn, an appraiser with the Johnson County Appraiser's Office, testified for the County. But her testimony is not at issue in this appeal.

When calculating the value of the CVS properties, the County completed an income approach and a cost approach. But the County did not rely on the cost approach to reach its ultimate valuations; instead, it used the cost approach "as a benchmark." Thus, the County relied on the income approach to value the properties.

Under the income approach, the County's 2015 valuations used estimated rental rates ranging from $11.50 to $16.40 depending on the classification of the building. It applied operating expenses based on square footage and the properties' classifications. It used these figures:

- vacancy and collection loss – 5%.
- operating expenses for the C+ property – $.70 per square foot;
- operating expenses for the remaining properties – $.90 per square foot;
- capitalization rate for the A- properties – 7.25%;
- capitalization rate for B+ properties – 7.50%;
- capitalization rate for B properties – 7.75%;
- capitalization rate for B- properties – 8.25%; and

4

- capitalization rate for the C+ properties – 9.00%.

The County's 2016 valuations used estimated rental rates ranging from $12 to $17 depending on the classification of the building, then applied these figures:

- vacancy and collection loss – 4%;
- operating expenses for A- properties – $.90 per square foot;
- operating expenses for B+, B, and B- properties – $1 per square foot;
- operating expenses for C+ properties – $.80 per square foot.

It then applied the same capitalization rates it used for the 2015 valuations.

Keller's capitalization rates included the "sales of new, buil[d]-to-suit properties." Yet Keller made no adjustments as a result of his reliance on those properties, asserting that the rental rates in the build-to-suit lease comparables inherently reflect the actual rental rates in an open and competitive market.

*The Taxpayer's Expert Testimony*

CVS called Gerald Maier, a partner with Mainland Valuation Services and a certified general real property appraiser in Kansas, as its expert witness. Maier had appraised each of the CVS properties at issue for both 2015 and 2016. When valuing property in Kansas, Maier values the fee simple estate, defined as the unencumbered ownership of the bundle of rights involved in real estate.

Maier made a fee simple valuation, which assumes that the property owner is selling the property without a lease and no longer intends to occupy it. Maier also valued each property using a hypothetical leased fee valuation, which assumes the property is leased by a moderate credit tenant and that two or three years remain on the lease. Maier

distinguished his hypothetical leased fee from a "leased fee estate" which, in appraisal practice, would value the actual contract in place.

Maier found several sales of operating CVS stores, but those sales were typically sale leasebacks. In those transactions, a tenant negotiates a lease with the owner and at the end of the lease the tenant purchases the property. Essentially, it is a way to finance construction of the property. Maier believed that appraisers should not consider sale leasebacks when valuing the fee simple estate because they involve "contract rights that enhance the value significantly over the fee simple value or just the property rights in the building." When lease terms are 25-30 years or long enough to amortize the cost of building the structure, there is some "pretty significant value that would be attributable to those contract rights." The CVS leases here had initial terms of 20 to 26 years.

Maier used the same methodology to value each of the subject properties. Maier used three approaches—cost approach, sales comparison approach, and income approach—and valued each property in fee simple and, alternatively, as a hypothetical leased fee. Although he considered all three values, Maier gave "[s]ignificant consideration" to the income approach value because it "is the most property specific when analyzing the income potential for the improvements" and "is generally considered to offer a reliable representation of investors' goals and objectives in regard[] to income producing properties." Because Maier ultimately relied on the income approach, we do not set out his cost approach or sales comparison approaches.

The income approach considers how much income an investor can anticipate by investing in the property. Maier's report noted that the income approach is "accepted as the most reliable method in the valuation of income producing investments." Maier found the highest and best use for the properties was retail development. He considered comparable rents using three categories—first-generation leases, second-generation leases with renovation, and second-generation leases without renovation.

Maier excluded first-generation leases from his analysis because they involve "significant contract rights that enhance the value significantly over the fee simple value." His report explained that their rental rates are based upon the construction costs, the land cost, and a reasonable developer profit as opposed to market factors, and tenants would not be willing to pay the same rate for space designed for another retailer's use. As a result, he did not consider first-generation leases indicative of the market rental rate for CVS properties. Maier considered first-generation leases comparable to sale leasebacks, which the 14th edition of The Appraisal of Real Estate states "are actually financing vehicles, [that] should not be used in estimating market rent.'"

Maier estimated two values for each property—a fee simple value and a hypothetical leased fee value. The fee simple value was consistently the lowest. For example, when Maier valued one CVS location for the 2015 tax year and assumed a hypothetical leased fee estate (assuming that the property was occupied and two to three years remained on the lease term with a moderate credit tenant at the time of sale), its value was $150 per square foot, or $1,680,000 total. When Maier valued that same property as if it were sold as a fee simple interest (assuming that the structure was vacant and had no lease) its value was $130 per square foot, or $1,460,000 total.

*BOTA's Summary Decision*

In its summary decision, BOTA noted that both parties relied on the income approach to value the subject parties. When considering the methodology of CVS's expert witness, BOTA found the hypothetical leased fee value, rather than the fee simple value, better indicated the fair market value of the CVS properties.

When considering the County's proposed values, BOTA found that income producing properties, such as those involved here, are best appraised using the income approach. BOTA compared the County's proposed value based on the income approach

7

to the County's proposed value based on the cost approach because that comparison could "be a valuable way to confirm that the income approach's value is realistic." Yet BOTA found that the County's cost approach values were significantly lower than its income approach values, so BOTA concluded that the County's income approach values were "not reliable."

BOTA found that the County had not met its burden of proof and concluded that the "subject properties should be valued based on Mr. Maier's hypothetical leased fee values with certain adjustments for capitalization rates." Maier applied a blanket capitalization rate of 8.5% for his hypothetical leased fee valuations, and a rate of 9.2% for his fee simple valuations. BOTA's adjustments reduced Maier's capitalization rates by 1/4% for properties in areas with median incomes between $75,000 and $100,000 and by 1/2% for properties in areas with median incomes over $100,000.

After the summary decision, both parties moved for a full and complete opinion.

*BOTA's Full and Complete Opinion*

BOTA's full and complete opinion found the County "has not met its burden" to show the correctness of its valuation. See K.S.A. 79-1609 (the County has burden of production and persuasion as to the valuation for taxation purposes of real property used for commercial purposes). BOTA then gave details why it did not find the County's evidence sufficient:

- the County's analysis was based on "only one class A rental comparison property and the class B properties are mostly build-to-suit properties";
- the County used a higher rental rate than it should have used for properties that were not build-to-suit properties; and
- the County used a lower vacancy rate than was typical in the market.

8

As to CVS's expert witness appraisals, BOTA found that Maier's analysis properly avoided first-generation leases, as they "were the product of a sale/leaseback" and were "actually financing vehicles."

BOTA considered Maier's two income approach methodologies which Maier termed "'fee simple'" and "'hypothetical leased fee.'" As explained above, Maier arrived at the "fee simple" value by valuing the property as if it were vacant, using a market vacancy, and applying a discount for a holding period. The value reflected a property unencumbered by any leasehold interest.

But BOTA found Maier's "hypothetical leased fee" value was a better indication of a property's fair market value because it assumed that the properties were occupied on the sale date, as would most likely be the case. Maier assumed the properties were occupied by a moderate credit tenant who had two to three years left on the lease.

Still, BOTA found that Maier's blanket capitalization rates disregarded the age of the properties and the demographics of their locations as represented by the median area income. One of the properties was built in 1959 and most of the rest were built in the late 1990s through 2009. Thus, as in its summary decision, BOTA reduced the capitalization rate Maier had used by 1/4% for property in areas with median incomes between $75,000 and $100,000 and by 1/2% for property in areas with median incomes over $100,000.

*BOTA's Order on Reconsideration*

The County petitioned for reconsideration, alleging that BOTA violated Kansas law by adopting the "hypothetical leased fee" method of valuation instead of its valuations and erred in some evidentiary rulings.

CVS also petitioned for reconsideration. It argued that BOTA erred by not adopting Maier's fee simple valuations and by adjusting Maier's capitalization rates.

In its subsequent order, BOTA stated that its decision had inadvertently inferred that all "cost approach values were significantly less than the income approach values" and deleted that language. Otherwise, BOTA made no substantive changes.

The County petitioned for judicial review and CVS cross-petitioned for judicial review.

*Analysis*

On appeal, the County argues that it established a prima facie case for its appraisal values and CVS failed to rebut them using accepted appraisal methodology. Second, the County argues that CVS used an appraisal method that contradicts Kansas law—the hypothetical leased fee. Finally, the County asks us to depart from *In re Equalization Appeal of Prieb Properties*, 47 Kan. App. 2d 122, 275 P.3d 56 (2012). This final argument underlies all the County's arguments. The County asserts that BOTA should have adopted its figures, which were consistently higher than CVS's figures.

CVS's cross-appeal argues that BOTA should have used Maier's fee simple method, which consistently results in values lower than the County's valuations and lower than Maier's hypothetical leased fee valuations.

*General Legal Principles*

We review BOTA's decisions as directed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 74-2426(a), (c); K.S.A. 77-603(a). Under the relevant statute, we may grant relief if the appellant shows that BOTA's decision was

based on errors of law and fact, was otherwise arbitrary, capricious, or unreasonable, or was not supported by substantial evidence. K.S.A. 77-621(c).

We begin by reviewing some general legal principles. The test for finding arbitrary and capricious conduct depends on the reasonableness of and foundation for the action. An order is arbitrary and capricious if it is unreasonable or without foundation in fact. See *In re Equalization Appeal of Tallgrass Prairie Holdings*, 50 Kan. App. 2d 635, 659-60, 333 P.3d 899 (2014). So whether BOTA acted unreasonably, arbitrarily, or capriciously depends on the quality of its reasoning. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010).

To the extent this issue involves interpretation of a statute, our review is unlimited. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017). Otherwise, we review factual findings to determine whether they are supported by substantial evidence in light of the record as a whole. K.S.A. 77-621(c)(7); *Sierra Club v. Moser*, 298 Kan. 22, 62-63, 310 P.3d 360 (2013). In making this determination, we must review evidence that supports and detracts from BOTA's findings. K.S.A. 77-621(d). "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 916, 157 P.3d 1109 (2007). In reviewing the evidence, we are not to reweigh or engage in de novo review of the evidence. K.S.A. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

We strictly construe tax provisions in favor of the taxpayer. See *In re Tax Appeal of River Rock Energy Co.*, 313 Kan. 936, 944, 492 P.3d 1157 (2021). When considering whether BOTA's decision is supported by substantial competent evidence, we will reverse only if we find that the decision was "so wide of the mark as to be outside the realm of fair debate." *Prieb*, 47 Kan. App. 2d at 137.

11

The subject property is real property mainly used for commercial purposes, so the County had the burden of production and persuasion before BOTA to show the correctness of its valuation. K.S.A. 79-1609. Likewise, the County, as the party challenging the validity of BOTA's action on appeal, bears "[t]he burden of proving the invalidity of agency action." K.S.A. 77-621(a)(1). And even when we find that BOTA erred, we do not reverse if that error was harmless. K.S.A. 77-621(e); *Sierra Club*, 298 Kan. at 47; *In re Equalization Appeal of Kansas Star Casino*, No. 116,782, 2018 WL 3486173, at *10 (Kan. App. 2018) (unpublished opinion).

When valuing property for ad valorem tax purposes, Kansas law requires that the valuation be based on a "fee simple interest, not the leased fee estate." *Prieb*, 47 Kan. App. 2d at 132.

> "Fee simple interest is defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. Stated another way, ownership of the fee simple interest is equivalent to ownership of the complete bundle of property rights that can be privately owned. This interest is in contrast to a leased fee interest defined as the ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." 47 Kan. App. 2d 122, Syl. ¶ 5.

Although Kansas tax statutes before 2016 do not refer to the term fee simple interest, "it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property as if in fee simple, requiring property appraisal to use market rents instead of contract rents if the rates are not equal." 47 Kan. App. 2d at 130 (citing K.S.A. 79-501 and K.S.A. 79-503a). The fee simple interest of real estate consists of tangible property, excluding intangible property interests. See K.S.A. 79-102; see also *In re Tax Protest of Strayer*, 239 Kan. 136, 142, 716 P.2d 588 (1986).

In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 requires that "[e]ach year all taxable and exempt real and tangible personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a." K.S.A. 79-503a defines "'[f]air market value'" as the amount of money that

> "a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. In the determination of fair market value of any real property which is subject to any special assessment, such value shall not be determined by adding the present value of the special assessment to the sales price."

Valuations must be performed in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP). See K.S.A. 79-505; *In re Equalization Appeal of Johnson County Appraiser*, 47 Kan. App. 2d 1074, Syl. ¶ 9, 283 P.3d 823 (2012). "These standards are embodied in the statutory scheme of valuation, and a failure by BOTA to adhere to them may constitute a deviation from a prescribed procedure or an error of law." *Board of Saline County Comm'rs v. Jensen*, 32 Kan. App. 2d 730, 735, 88 P.3d 242 (2004).

I.     *Did CVS Fail to Rebut the County's Prima Facie Case?*

The County first argues that it made a prima facie case that its ad valorem values reflect fair market value. But the County bases that conclusion solely on the fact that CVS did not move for a peremptory ruling so BOTA did not grant one. Rather, BOTA considered all the facts. But BOTA expressly found in its decision that the County failed to meet its burden of proof. It could have stopped there rather than considering all the facts.

13

The County's main assertion, as we understand it, is that CVS failed to rebut its prima facie case because CVS used methods that fail to comply with Kansas law. But this is not a stand-alone issue. Rather, that depends on the validity of the County's assertion that its methods comply with Kansas law, while CVS's methods do not. Whether that assertion succeeds or fails depends on the resolution of other issues, below.

II.     *Did BOTA Erroneously Interpret or Apply the Law?*

*General Legal Principles*

Kansas law requires valuation of the fee simple interest when determining ad valorem valuation. The fee simple interest is defined as "'[a]bsolute ownership unencumbered by another interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.' The Appraisal of Real Estate, p. 114 (13th ed. 2008)." *Prieb*, 47 Kan. App. 2d at 130; see *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004) (Kansas ad valorem valuation contemplates valuation of the fee simple interest). In other words, ownership of the fee simple interest is equivalent to ownership of all of the property rights associated with the subject property that can be privately owned. *Prieb*, 47 Kan. App. 2d at 130.

Although Kansas law did not previously reference the term "fee simple," the Legislature amended K.S.A. 74-2433 in 2016 to affirmatively state that valuation appeals before BOTA shall be decided upon a determination of the fair market value of the "fee simple" of the subject property. K.S.A. 74-2433(g) states, in part:

> "It is the intent of the legislature that proceedings in front of the board of tax
> appeals be conducted in a fair and impartial manner and that all taxpayers are entitled to a
> neutral interpretation of the tax laws of the state of Kansas. The provisions of the tax laws

of this state shall be applied impartially to both taxpayers and taxing districts in cases before the board. Valuation appeals before the board shall be decided upon a determination of the fair market value of the *fee simple* of the property." (Emphasis added.)

The ad valorem tax appraisal method should conform to generally accepted appraisal practices. See K.S.A. 79-504; K.S.A. 79-505.

The concept that Kansas law requires valuation of the fee simple interest is consistent with K.S.A. 79-102, which states: "[T]he terms 'real property,' 'real estate,' and 'land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." This definition requires that all "rights and privileges" in real property are to be valued. See *Prieb*, 47 Kan. App. 2d 122, Syl. ¶ 6. A leasehold estate, except an oil and gas lease, is real estate under Kansas law. A leasehold estate is not subject to real estate taxation. Instead, a unitary assessment method is used in which one value is assigned to a lot or tract of real estate and one tax is assessed and levied on it. *Board of Johnson County Comm'rs v. Greenhaw*, 241 Kan. 119, 123, 734 P.2d 1125 (1987). As a result, "[f]or purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." *Prieb*, 47 Kan. App. 2d 122, Syl. ¶ 6.

K.S.A. 79-412 is the statutory basis for the unitary assessment method: "It shall be the duty of the county . . . appraiser to value the land and improvements. The value of the land and improvements shall be entered on the assessment roll in a single aggregate, except as hereinafter provided." In determining the ad valorem valuation, Kansas law assumes the hypothetical condition of an assumed sale as of January 1 of the applicable tax year. K.S.A. 79-1455 states: "Each year all taxable and exempt real and tangible

15

personal property shall be appraised by the county appraiser at its fair market value as of January 1 in accordance with K.S.A. 79-503a."

Under K.S.A. 79-501, "[e]ach parcel of real property shall be appraised at its fair market value in money, the value thereof to be determined by the appraiser from actual view and inspection of the property." K.S.A. 79-503a defines fair market value as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market."

K.S.A. 79-503a gives broad guidance on the methods that may be used to determine the fair market value of a property:

"Sales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors including but not by way of exclusion:

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction of improvements;

"(f) productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(g) earning capacity as indicated by lease price, by capitalization of net income or by absorption or sell-out period;

"(h) rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended;

"(i) sale value on open market with due allowance to abnormal inflationary factors influencing such values;

"(j) restrictions or requirements imposed upon the use of real estate by the state or federal government or local governing bodies, including zoning and planning boards or commissions, and including, but not limited to, restrictions or requirements imposed upon the use of real estate rented or leased to low income individuals and families, as authorized by section 42 of the federal internal revenue code of 1986, as amended; and

"(k) comparison with values of other property of known or recognized value. The assessment-sales ratio study shall not be used as an appraisal for appraisal purposes."

The appraisal process utilized in the valuation of all real and tangible personal property for ad valorem tax purposes shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law.

*The County's Assertions of Error*

*Appraisers' use of hypotheticals*

The County argues that the only hypothetical that appraisers can use when determining the fair market value of real property is the January 1 sale date. See K.S.A. 79-1455. But Maier disclosed the factors he used in his hypothetical and the list of factors in K.S.A. 79-503a (above) is nonexclusive—the statute does not prohibit the use of additional hypotheticals. "[W]e do not presume that a hypothetical condition may not be used in valuation merely because it was not included in the list." *In re Equalization Appeal of Arc Sweet Life Rosehill*, No. 113,692, 2016 WL 3856666, at *10 (Kan. App. 2016) (unpublished opinion); see also 2016 WL 3856666, at *15 (finding it permissible to determine the difference between the value of the property under a hypothetical vacant condition and its value as occupied to isolate the value of the taxable estate separate from the business being conducted on the subject property). And the County admits that its

17

Property Valuation Division's standards permit use of a hypothetical condition if it is directly related to the appraisal assignment. See USPAP, p. U-3 (2014/2015 ed.).

*Appraisal of Real Estate as the exclusive source of generally accepted appraisal practices*

More generally, the County contends that if a methodology is not endorsed in The Appraisal of Real Estate or required by law, it cannot be used to determine an *ad valorem* valuation. Here, it cites K.S.A. 79-503a's requirement that the appraisal process "shall conform to generally accepted appraisal procedures and standards which are consistent with the definition of fair market value unless otherwise specified by law." So, it contends, because Maier's hypothetical leased fee method is not endorsed in The Appraisal of Real Estate or by statute, it fails to conform to generally accepted appraisal practices (GAAP). We think that reads the statute too narrowly. The County fails to show that The Appraisal of Real Estate is the sole source of generally accepted appraisal procedures.

*The continuing validity of* Prieb

The County does not argue that BOTA erroneously interpreted the law. Rather, the County argues that *Prieb* was wrong and should not bind BOTA's decisions. *Prieb* determined, among other matters, that because build-to-suit leases are essentially financing agreements, appraisers should not use them in determining market rent unless they make adjustments. 47 Kan. App. 2d at 135-36.

But BOTA is bound by *Prieb* even if it may disagree with it. By statute, BOTA is "bound by the doctrine of stare decisis limited to published decisions of an appellate court." K.S.A. 74-2433(a). Moreover, "[t]he doctrine of stare decisis is particularly compelling in cases where, as here, the legislature is free to alter a statute in response to

court precedent . . . but declines to do so." *State v. Quested*, 302 Kan. 262, 278, 352 P.3d 553 (2015); see also *McCullough v. Wilson*, 308 Kan. 1025, 1035, 426 P.3d 494 (2018).

We address the County's specific anti-*Prieb* arguments below. Yet we are not persuaded to depart from that case. See *In re Equalization Appeals of Walmart Stores*, 61 Kan. App. 2d __, 2021 WL 4699199, at *9-10 (Kan. App. 2021).

*Is* Prieb*'s holding inconsistent?*

The County argues that *Prieb* is inconsistent as to whether it bars appraisers from considering all build-to-suit leases, or just build-to-suit-leases without adjustments, or only *first generation* build-to-suit leases. It also contends that the following is not a holding, but rather judicial dicta:

> "[B]uild-to-suit leases are not reflective of market conditions and may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad valorem tax purposes in Kansas without a disentanglement by adjustments that is beyond the scope of this appeal." *Prieb*, 47 Kan. App. 2d 122, Syl. ¶ 8.

The County misconstrues these words to mean that the use of build-to-suit rents adjusted according to GAAP practice is outside the scope of the appeal. But the court stated only that a disentanglement by adjustments was beyond the scope of the appeal.

*Prieb*'s holding that rental rates in commercial build-to-suit leases do not reflect market conditions is not dicta. And *Prieb* is not the sole decision to recognize that rental rates in build-to-suit leases do not—in and of themselves—reflect the current rental rates in an open and competitive market at the time of the hypothetical sale envisioned by K.S.A. 79-1455. See, e.g., *In re Equalization Appeal of Target Corporation*, 55 Kan. App. 2d 234, 244, 410 P. 3d 939 (2017); *In re Tax Appeal of Arciterra BP*, No. 121,438,

19

2021 WL 1228104, at *10 (Kan. App. 2021) (unpublished opinion); *ARC Sweet Life Rosehill*, 2016 WL 3856666, at *15.

Still, *Prieb* did not hold that build-to-suit leases cannot be used in determining market rent. To the contrary, appraisers may consider build-to-suit leases if they make the appropriate showing:

> "Kansas law does not hold that build-to-suit leases may never be considered in determining market rent. If, for example, an appraiser can show that a build-to-suit lease was motivated by market terms and can isolate above- or below-market rents to make the necessary adjustments, BOTA could find that a market rent determination is properly supported and based on appropriate, comparable leases. See, e.g., *Southlake Indiana LLC*, 135 N.E.3d at 697-98." *Arciterra*, 2021 WL 1228104, at *10.

Keller did not make that showing here. Instead, he rejected *Prieb*'s finding that adjustments should be made and essentially considered build-to-suit properties as creating their own market. But Keller did not persuade BOTA that CVS's properties are a market unto themselves. Nor did he explain why the long-term leases that CVS has, which greatly reduce the risk to the owner and correspondingly enhance the value of the property, are not above-market rents or are typical of the broader market not limited to build-to-suit properties.

### *Does* Prieb *misrepresent accepted appraisal practice?*

The County next argues that *Prieb* misunderstood The Appraisal of Real Estate, and that build-to-suit leases are not mentioned in the revised version of The Appraisal of Real Estate (14th ed. 2013). But the page *Prieb* cited from that book generally discusses that appraisers need to review all leases for any item that might be atypical of the market and to make necessary adjustments. No one quibbles with that basic assertion. *Prieb* thus

did not cite The Appraisal of Real Estate as authority specific to build-to-suit leases, nor was its holding based on that source. 47 Kan. App. 2d at 135-36.

Similarly, the County argues that the panel in *Prieb* relied on unreliable articles— one in *The Appraisal Journal* and another from the internet. The County asserts these articles reflected merely one author's opinion. The County also argues that cases *Prieb* cited from other jurisdictions do not support its holding and that *Prieb* incorrectly reweighed the evidence. But the time to make these and other arguments attacking *Prieb* was in a petition for review of that decision. We do not delve into those assertions of error here.

### *Must property be appraised as vacant?*

The County also asserts that Maier's practice of appraising real property as vacant is contrary to law. But see *In re Target Corporation*, 55 Kan. App. 2d at 243 (when valuing property in fee simple as unencumbered, the task is to value the property as if vacant and available to be leased at market).

But the County's assertion is purely academic here. Although Maier's fee simple valuation considered the property as if vacant, BOTA did not adopt his fee simple approach, and Maier's approach that BOTA did adopt assumed a lease in place. Thus, we find it unnecessary to determine whether appraisers may consider real property as vacant, rather than occupied if it is, in fact, occupied. See *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016) (holding that "Kansas courts do not issue advisory opinions").

21

*Does* Prieb *incorrectly define fee simple?*

The County next claims that the *Prieb* court incorrectly defined fee simple. *Prieb* relied on The Appraisal of Real Estate's definition of fee simple as: "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." The Appraisal of Real Estate, p. 114 (13th ed. 2008).

But the County invites us to rely instead on the definition of fee simple in Black's Law Dictionary 760 (11th ed. 2019): "An interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs; esp., a fee simple absolute.—Often shortened to fee."

Black's definition of fee simple is describing the legal interest—one may own land in fee simple even if that land is "encumbered" by a mortgage, a restrictive covenant, or a lease, for example. See, e.g., *Knop v. Gardner Edgerton Unified Sch. Dist. No. 231*, 41 Kan. App. 2d 698, 706, 205 P.3d 755 (2009) (discussing restrictive covenants). But in appraisal practice, a fee simple estate is "unencumbered by any other interest." The Appraisal of Real Estate, p. 114 (13th ed. 2008). Although the County does not explain the significance of the definitional differences here, we assume it prefers Black's definition because it would open the door for them to consider contract leases. And in this case, as perhaps in most big-box cases, using contract leases rather than market leases may increase the valuation amounts.

This court recently considered and rejected a similar argument:

> "The County dislikes *Prieb*'s definition of 'fee simple interest' and urges us to instead apply the definition of that term from Black's Law Dictionary. But we find it unnecessary to parse any linguistic differences between the two because the County does

22

not show us how the *Prieb* definition is wrong, how the *Prieb* definition substantially differs from Black's definition, or how use of Black's definition would make a difference in BOTA's decision." *Arciterra*, 2021 WL 1228104, at *9.

We find this analysis to be well-reasoned and adopt it here.

*Are build-to-suit leases like financing agreements?*

The County next challenges the *Prieb* court's statement that build-to-suit leases are essentially financing agreements. In *Prieb*, the court stated:

"Before consulting various authoritative sources on this question, we take a common-sense approach to the problem: What is the nature of a build-to-suit lease? We suggest that such a lease is essentially a financing agreement between a lessor and a lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the required construction—plus a measure of profit—over the lease term . . . . Accordingly, when one takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent, but rather just reflective of the rate required in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter. Reliable source material is in agreement with this overview." 47 Kan. App. 2d at 132-33.

The County argues that a finance lease or a capital lease transfers title of the leased property to the lessee at the end of the lease term but that a build-to-suit lease does not, so the two are not identical. We may agree, but this argument misses the point. By stating that build-to-suit leases were "essentially" financing agreements, the *Prieb* court did not equate the two in every legal respect. Rather, it explained that because build-to-

suit leases shared some basic characteristics with financing agreements, they are atypical of market rent so must be adjusted if used in appraisals.

To this, the County contends that *Prieb*'s market value assessment, which we quoted above, is wrong.

> "The hypothetical leased fee artificially inflates the risk associated with the Subjects by downgrading the quality of tenant most likely to lease the Subjects, deflating the rent rate to a level that a lesser quality tenant would be capable of paying; increasing the vacancy expectation while knowing that the Subjects have never been vacant and will be occupied into the foreseeable future and reducing the leasing term while knowing that the Taxpayers will not face the frequent costs of releasing. The result is a capitalization rate that is contrary to the known facts as to how the Subjects and its market actually operate.
>
> "[This] remove[s] investors and any user who could use the Subjects in their current use from the market participant pool even though these are the most likely and most optimal buyers. . . .
>
> "These actual legal characteristics of the Subjects enhance the value of the Subjects. Acknowledging this enhancement is not the same as valuing the actual contracts rights. That is why market is used and this is the market in which these Subjects operate."

But the County failed to persuade BOTA that CVS's properties, which were build-to-suit properties, created their own market so should be compared only with other such properties. We are equally unpersuaded. Moreover, the hypothetical leased fee approach minimizes any contract rights that may improperly increase the value estimation in the broader market and produce lack of uniformity.

Our court has upheld in other cases the methodology that Maier used and that BOTA adopted here. See, e.g., *Arciterra*, 2021 WL 1228104, at *9 (upholding BOTA's

reliance on Maier's methodology and use of a hypothetical leased fee analysis); *In re Target Corporation*, 55 Kan. App. 2d at 239, 244-45 (finding Maier's use of a hypothetical leased fee analysis was supported by substantial competent evidence and complied with USPAP). We do so as well. We do not mean to suggest that Maier's hypothetical leased fee analysis is the sole methodology that complies with Kansas law. But we find no error in BOTA's reliance on that method here.

### *Remaining challenges to* Prieb

The County next argues that *Prieb* overreached by establishing an inflexible rule about build-to-suit leases—rather, BOTA should determine case-by-case whether build-to-suit leases are probative of market value.

We agree that each case will present different facts and that BOTA must rely on the evidence presented in each case in reaching its result. But it cannot ignore published legal precedent that it is bound to follow, such as *Prieb*.

We disagree that *Prieb*'s rule is inflexible. That rule gives appraisers the flexibility to use build-to-suit leases with proper adjustments, as noted above. And the County shows no error in *Prieb'*s analysis showing why build-to-suit leases generally do not reflect market rent. We find no reason to depart from *Prieb*.

### III.    *Is BOTA's Decision Supported by Substantial Competent Evidence?*

The County mentions a substantial competent evidence issue but fails to argue it. We assume that the County's argument is that because *Prieb* was incorrect, its expert testimony complied with the law while CVS's expert evidence did not. But we have rejected the County's underlying premise that *Prieb* is dead. And if the County meant to raise some other issue of substantial evidence, it waives or abandons it by failing to

25

develop the argument. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issues not adequately briefed are considered waived or abandoned); *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue).

IV. *Was BOTA's Decision Unreasonable, Arbitrary, or Capricious?*

Similarly, the County mentions that BOTA's decision was unreasonable, arbitrary, or capricious as an issue but it does not develop this argument. It states only that BOTA's decision was unreasonable, arbitrary, or capricious because it based the fair market value of the properties on appraisals that do not generally match generally accepted appraisal procedures and standards. Yet the County does not state which GAAP standard was violated or how BOTA's decision violates that GAAP standard. This argument merely recasts the County's anti-*Prieb* arguments that we have rejected above. The County does not support its contention that BOTA's order is unreasonable, arbitrary, or capricious with any factual argument or legal authority. We thus consider it waived or abandoned.

V. *Did BOTA Err by Embracing a Leased Fee Valuation?*

CVS's cross-petition argues that BOTA erred by adopting Maier's hypothetical leased fee valuations rather than his lower fee simple valuations.

CVS contends that by relying on Maier's hypothetical leased fee appraisal amounts, BOTA failed to follow *Prieb*'s directive that for the "purposes of ad valorem taxation, Kansas law requires the valuation of the fee simple estate and not the leased fee interest." 47 Kan. App. 2d 122, Syl. ¶ 6.

But Maier did not value the "leased fee interest." As Maier explained, that appraisal method would have valued the actual contract in place. *Prieb* used that term as Maier did, defining it as "[t]he ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." The Appraisal of Real Estate, p. 114." *Prieb*, 47 Kan. App. 2d at 130. The leased fee is thus a lesser estate in property including only the landowner's right to receive rents during the term of the lease, plus the value of the reversion upon its expiration. 47 Kan. App. 2d at 132. Yet Maier did not value the contract in place, or the leased fee interest, but the property rights as determined by a hypothetical lease.

CVS fails to show that Maier's use of the hypothetical leased fee appraisal violates *Prieb*. Rather, Maier used this approach because he was trying to comply with *Prieb*. We believe he succeeded in that attempt.

"We agree with one noted commentator, who stated that when valuing the fee simple estate:

"'The appraiser theoretically should approach the valuation as if the property were vacant and available to be leased at market rent, recognizing the necessary adjustment for lease-up to stabilized occupancy. Although the definitions are not all consistent with this approach, in most assignments that involve a fee simple estate for a leased property, the appraiser is seeking a value that assumes fully leased (or at a normalized occupancy level) *at market rent*.' (Emphasis added.) Lennhoff, *Fee Simple? Hardly,* The Appraisal Journal 400, 402 (Oct. 1997)." *Prieb*, 47 Kan. App. 2d at 132.

This approach is consistent with what Maier did via his hypothetical leased fee appraisal—he sought a value that assumed the property was fully leased at market rent. He thus sought a value that assumed the property could be leased at market rent at a normalized occupancy level, rather than assuming the property could not be leased or was leased long-term. Maier assumed a shorter lease term than is often present in retail stores

such as CVS because Kansas law requires appraisals to reflect market rent—property rights rather than contract rights. The assumptions Maier made minimize any contract rights that may influence his value estimate, as *Prieb* requires. CVS fails to show that Maier's valuation was not an appropriate way to value the fee simple interest, as *Prieb* requires.

BOTA reasonably determined that Maier's hypothetical leased fee appraisal was the best indication of the property's fair market value. We find no reason to set aside that determination.

Neither party has shown the invalidity of BOTA's decision regarding the valuation of the CVS properties. We, therefore, affirm BOTA's full and complete opinion.

Affirmed.