NOT DESIGNATED FOR PUBLICATION

No. 126,120

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WADE ABBEY, O.D.,
*Appellee*,

v.

KANSAS BOARD OF EXAMINERS IN OPTOMETRY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Oral argument held October 17, 2023. Opinion filed March 15, 2024. Affirmed in part, reversed in part, and remanded with directions.

*Timothy D. Resner*, of Frieden & Forbes, LLP, of Topeka, for appellant.

*Christopher M. McHugh* and *Diane L. Bellquist*, of Joseph, Hollander & Craft, LLC, of Topeka, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER and COBLE, JJ.

ARNOLD-BURGER, C.J.:  This action is an appeal from the district court which overturned a decision by the Board of Examiners in Optometry (Board) suspending Dr. Wade Abbey's license to practice optometry in Kansas and imposing a fine. After reviewing the evidence, we affirm in part, reverse in part, and remand this case to the Board for consideration of the appropriate disciplinary action in light of this decision.

1

Wade Abbey is duly licensed to practice optometry in Kansas by the Board. A person may not practice optometry in the state of Kansas unless licensed by the Board. K.S.A. 65-1505. An optometrist cannot practice the healing arts, a field generally limited to medical doctors or surgeons. K.S.A. 65-2872; K.S.A. 65-2807.

Dr. Michael Parsons is licensed to practice the healing arts in Kansas as an ophthalmologist. A person may not practice medicine in Kansas as a doctor or surgeon without being licensed by the Kansas Board of Healing Arts. K.S.A. 65-2807. Dr Parsons resides in Ohio and conducts his practice in Kansas solely by telemedicine. Ophthalmologists can personally provide optometry services without getting a separate optometry license. K.S.A 65-1508(a).

Corporations cannot engage in the practice of optometry. K.S.A. 65-1524. It is a profession limited to individuals. *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018). That said, the Professional Corporation Law of Kansas (PC Law) permits licensed physicians to form professional corporations to provide medical services. K.S.A. 17-2706 et seq. When seeking to form a professional corporation, the licensees forming the corporation must include a certificate from the regulating board of the profession involved showing "that each of the incorporators is duly licensed to practice that profession." K.S.A. 17-2709(a). If the licensees of the potential corporation seek to practice different professions, a certificate of each regulatory board is required. K.S.A. 17-2709(a).

There are limitations to the organization of a professional corporation seeking to practice different professions. It may be organized only for the purpose of rendering one type of professional service and service ancillary thereto and "shall not engage in any other business" unless an exception applies. K.S.A. 17-2710. One exception that applies

2

is that licensees may practice medicine and optometry together. K.S.A. 17-2707(b)(7), (b)(9); K.S.A. 17-2710.

Kansas Physicians Eyecare Group, P.A. (KPEG) is a professional association organized under the PC Law and is solely owned by Dr. Parsons. It was formed and authorized only for the purpose of practicing medicine, not optometry. Yet, it can practice optometry without getting an optometry license if optometry is simply ancillary to the ophthalmologist practice. K.S.A. 17-2710. The only benefit mentioned by the parties here to licensing KPEG as a medical practice, with ancillary optometry services—rather than also getting an optometry license—relates to the need for physical separation between the medical clinic and any business dispensing eyewear. If an optometrist obtains a beneficial interest in a business that markets ophthalmic goods, the operations must be "separate and apart" from each other. K.A.R. 65-10-3. "Separate and apart" includes "being physically separated." K.A.R. 65-10-3. There does not appear to be any similar requirement of medical ophthalmology practices. See K.A.R. 100-25-2.

Dr. Abbey entered into an employment agreement with KPEG as an optometrist. As an employee, he has no management authority or ability to control the operations or location of KPEG.

Stanton Optical sells eyewear to consumers. It renders neither medical nor optometric care to patients. Stanton Optical and KPEG are separate legal entities but occupy the same building in Wichita. Stanton Optical operates on one side of the interior space while KPEG operates on the other. There are no floor to ceiling physical barriers separating the spaces. A side-by-side practice arrangement—under the optometry regulations—occurs where an optometry practice works right next to a commercial eyeglasses dispensary business. The businesses must be separate entities, both physically and in their business functions. K.A.R. 65-10-3.

Large signs on the exterior of the building dominate with the name "Stanton Optical." Much smaller signs on at least one of the exterior doors bears the name "Kansas Physicians Eyecare Group." There are three entrances into the shared space.

Stanton Optical advertises free eye exams. However, the eye exams are not free. Instead, a customer receives a credit for the cost of the eye exam against any lenses or frames they buy from Stanton Optical. It is undisputed that Dr. Abbey has no control or authority over Stanton Optical's advertisements. Stanton Optical and KPEG have a management agreement in which they share some employees. There is nothing about such an agreement that violates any state statutes or regulations related to optometrists or ophthalmologists.

Stanton Optical's website includes a disclaimer that "Stanton Optical is not an eye care provider and does not provide eye examinations." Stanton Optical has also posted a disclaimer at its physical locations that eye examinations are provided by KPEG. KPEG does not display any signs disassociating itself with Stanton Optical.

The Board instituted action against Dr. Abbey for statutory unprofessional conduct related to his employment by KPEG, an entity that was not licensed to practice optometry. It also brought action against Dr. Abbey for violating several regulations concerning his connection with Stanton Optical, its advertising, and lack of complete physical separation between it and his offices.

After a hearing, the Board suspended Dr, Abbey's license to practice optometry for six months, contingent upon Dr. Abbey obtaining employment with an employer that is not in violation of the Kansas Optometry Act, and imposed a $2,500 fine. Dr. Abbey appealed the decision to the Shawnee County District Court, which set aside Dr. Abbey's suspension, finding that the Board's actions were contrary to the law, and entered without the support of substantial competent evidence. The Board has now appealed to this court.

ANALYSIS

I.  OUR STANDARD OF REVIEW IS GOVERNED BY THE KANSAS JUDICIAL REVIEW ACT

The Kansas Judicial Review Act (KJRA) defines the scope of judicial review of the Board's action. K.S.A. 77-603(a). We treat this appeal as though it had been made directly to us and give no deference to the district court's assessment of the Board's decision. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). Because of this standard, we will not parse the district court's decision at all, although we find it to be well-reasoned and thorough in most respects.

And even though this is the Board's appeal from the district court's decision, the burden of proving the invalidity of the Board's action rests on the party asserting the invalidity, in this case Dr. Abbey. See K.S.A. 77-621(a)(1).

Under the KJRA, a court shall grant relief only in limited circumstances. K.S.A. 77-621(c). Abbey argues that he was entitled to relief because:

> "(4) the agency has erroneously interpreted or applied the law;
> . . . .
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> "(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

5

When determining whether the agency erroneously interpreted or applied the law, appellate courts exercise unlimited or de novo review without deference to the agency's view. *Hanson v. Kansas Corp. Comm'n*, 313 Kan. 752, 762, 490 P.3d 1216 (2021).

When determining whether substantial evidence supports the Board's decision, this court looks to whether there is sufficient evidence to support the findings of fact based on "all the relevant evidence in the record" including all evidence that detracts from the finding and all evidence that supports the finding. K.S.A. 77-621(d). When reviewing the evidence, this court "shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

And finally, in determining whether the agency's action was unreasonable, arbitrary, or capricious, we generally examine whether the decision has a foundation in fact. An agency action taken without regard to the benefit or harm of all interested parties which is so wide of the mark that it lies outside the realm of fair debate is unreasonable. *In re Tax Application of Emporia Motors, Inc.* 30 Kan. App. 2d 621, 624, 44 P.3d 1280 (2002). If an action is unreasonable and without foundation in fact—meaning it is not supported by substantial evidence—it is arbitrary and capricious. 30 Kan. App. 2d at 624; *In re Equalization Proceeding of Amoco Production Co*., 33 Kan. App. 2d 329, 333, 102 P.3d 1176 (2004).

Dr. Abbey argues that the Board's findings were not supported by law or fact and that the Board's imposition of discipline was unreasonable, arbitrary, or capricious.

The underlying facts here are largely undisputed by the parties and will be addressed as each of Dr. Abbey's alleged violations are discussed.

II.     THE BOARD FOUND DR. ABBEY COMMITTED THREE INSTANCES OF STATUTORY UNPROFESSIONAL CONDUCT

"A licensee's license may be revoked, suspended or limited . . . upon a finding . . . (b) [t]he licensee has committed an act of unprofessional conduct or professional incompetence." K.S.A. 65-1517(b).

As it relates to the allegations here, Kansas defines unprofessional conduct by an optometrist, in part, as:

> "(2) Engaging in the practice of optometry as an agent or employee of a person not licensed under the optometry law.
> . . . .
> "(5) Aiding or abetting the practice of optometry by an unlicensed, incompetent or impaired person.
> . . . .
> "(18) Allowing improper interference with the licensee's professional judgment in providing care." K.S.A. 65-1516(b).

These are the only three statutory provisions Dr. Abbey was found by the Board to have violated.

A.  *The evidence supported the Board's finding that Dr. Abbey violated K.S.A. 65-1516(b)(2) by engaging in the practice of optometry as an agent or employee of a person not licensed under the Kansas Optometry Law.*

The Board determined that Dr. Abbey committed unprofessional conduct by engaging in the practice of optometry as an agent or employee of a person not licensed under the optometry law.

7

The relevant facts are not in dispute. Dr. Abbey entered a contract to provide optometric services for KPEG, a licensed medical facility that does not have a separate license to provide optometric services. The question is whether KPEG, as a licensed medical facility, can provide optometric services and whether Dr. Abbey can provide those services.

Although generally limited to one and only one profession (and services ancillary thereto), professional corporation licensees may practice medicine and optometry together, but unless the optometry practice is ancillary to the medical practice, the corporation must be properly licensed by each profession. K.S.A. 17-2707(b)(7), (b)(9); K.S.A. 17-2709(a); K.S.A. 17-2710.

There is no dispute or misinterpretation of the law. Both parties agree on the law that applies, the issue is a factual one—was Dr. Abbey's optometry practice ancillary to Dr. Parsons' ophthalmology practice? "Ancillary" is defined as "(1) subordinate: often with *to*" or (2) that serves as an aid; auxiliary." Webster's New World College Dictionary 52 (5th ed. 2018). Optometry can be ancillary to ophthalmology. As the Board notes in its brief, "the possibility exists for optometric services to be ancillary to medical services" for example, optometrists "routinely provide pre- and post-operative care to ophthalmology practices."

Dr. Abbey contends that K.S.A. 17-2710 does not apply to prohibit his practice because his practice of optometry was ancillary to Dr. Parsons' medical practice. But, the Board argues, that is not the case here because Dr. Abbey did not act as an ancillary to Dr. Parsons in any practical matter.

Both parties cite the Kansas Supreme Court decision in *Central Kansas Medical Center*, 308 Kan. at 1011-14, for its discussion of the ancillary exception and the

8

corporate practice of medicine doctrine. The facts of the case are important and much like those here.

Central Kansas Medical Center (CKMC) hired a family medicine physician to provide family medicine services. The family medicine clinic the physician worked at was consolidated with an urgent care clinic into a single clinic. A corporate morass followed which is largely immaterial here. Relevant to this case, the corporation was licensed to operate an ambulatory surgical center (ASC). The corporate practice of medicine doctrine forbids a corporation from contracting with a physician to practice medicine that the corporation itself is not licensed to perform. 308 Kan. at 1011. So a corporation with an ASC license could hire physicians to practice medicine within the scope of the license: "to operate 'primarily for the purpose of performing surgical procedures.'" 308 Kan. at 1011 (quoting K.S.A. 65-425[f]).

But the physician involved in the case was not a surgeon nor was he hired to perform any surgical procedures. He was hired to practice family medicine, and he had no privileges to perform surgical procedures, thus he did not fit under the surgical criteria of the ASC license. The question became whether the physician's practice was ancillary to the conduct allowed under the ASC license. The Kansas Supreme Court held that an ASC is primarily operated for the purpose of performing surgical procedures and that "a medical service that is necessary to perform surgery safely falls within this scope" which would include ancillary services such as laboratory, radiology, and pharmacy services. 308 Kan. at 1013.

But "a medical service that bears no relation to surgical procedures falls outside the scope of an ASC license." 308 Kan. at 1014. As the Kansas Supreme Court saw it, to allow an "ASC to provide medical services that are unrelated to its surgical purpose would erase the distinction the Legislature made between the medical care facilities." 308 Kan. at 1014. Under the facts of the *Central Kansas Medical Center* case, the physician's

9

family medicine practice fell outside CKMC's ASC license "because it bore no relation to the surgical procedures." 308 Kan. at 1014. In reaching its decision, the court looked to the specific care that the physician gave and noted that he "never had surgical privileges . . .; he supplied no medical services to the surgery department; and CKMC hired him to provide primary care, nothing more." 308 Kan. at 1014.

Again, the question here is a factual one, whether Dr. Abbey's optometry practice was ancillary to Dr. Parsons' ophthalmology practice.

Dr. Abbey argues that it is, pointing to his testimony that he helps Dr. Parsons with certain aspects of Dr. Parsons' work that he cannot do through telemedicine. Dr. Abbey explained that there were times where Dr. Parsons had patients that he referred to Dr. Abbey for dilated fundus examinations, evaluating cataract or reductions in visual acuity, and making referrals to other medical doctors.

In contrast, the Board argues that Dr. Abbey's practice was not ancillary to Dr. Parsons' practice because Dr. Abbey performed his services independently of Dr. Parsons. The Board points to Dr. Abbey's testimony that "most of my exams are routine eye exams" that Dr. Parsons was "not involved in." Dr. Abbey testified, "All I do is do exams and go home."

Dr. Abbey reinforced this during his deposition prior to the hearing. During cross-examination, when asked, "So you conduct eye exams and you write prescriptions?" Dr. Abby responded, "Yep. Yes." Counsel clarified, "There is nothing else you do?" and Dr. Abbey responded "No." The Board also notes in its brief that Dr. Abbey did not even meet Dr. Parsons until speaking with him in a Zoom call roughly seventeen months after Dr. Abbey began working for him. In fact, the evidence suggests that all Dr. Parsons does is eye exams as well. Dr. Abbey testified that if a patient needs ophthalmological services

10

which Dr. Parsons could not provide through telemedicine, he refers the patient to a network of doctors.

Under the facts provided, there is sufficient evidence to support the Board's findings of fact based on "all of the relevant evidence in the record" including all evidence that detracts from the finding and all evidence that supports the finding. K.S.A. 77-621(d). Although an optometrist's work could, in theory, be ancillary to an ophthalmologist's work, Dr. Abbey fails to carry his burden of proof to establish that it was here. Although Dr. Abbey testified that he did provide some services to Dr. Parsons, he did not reveal in his testimony as to how often that occurred. Instead, he just said that there are "instances" where he has assisted Dr. Parsons' telemedicine work. If a few instances of providing assistance are enough to qualify as ancillary work, then Dr. Abbey's practice was ancillary to that of Dr. Parsons. But the statute must demand more from someone acting ancillary to another practitioner, otherwise the limitations set out in K.S.A. 17-2710 could be easily sidestepped by incorporating as one type of practice, hiring an "ancillary" who provides ancillary services once, and then engages in their own practice independent of the purpose for which the corporation was officially formed.

The evidence was overwhelming that the bulk of Dr. Abbey's work was done independently and did not involve Dr. Parsons in any way. Dr. Parsons did not supervise or review Dr. Abbey's work. The only medical doctor that Dr. Abbey had contact with was Dr. Crystal Kennedy, who did his onboarding and was not licensed in Kansas. Without Dr. Abbey's work being subordinate to, or serving in aid of, Dr. Parsons, it would not qualify as ancillary work. And if Dr. Abbey's practice was not ancillary to Dr. Parsons', KPEG was engaged in a business (optometry) other than what it was organized to do (ophthalmology).

When considering all the record as a whole, there was sufficient evidence to support the Board's conclusion that Dr. Abbey was engaged in optometry as an employee

11

of KPEG, a corporation not licensed to practice optometry. As a result, Dr. Abbey was violating K.S.A. 65-1516(b)(2) which qualifies as unprofessional conduct.

> B. *There was insufficient evidence for the Board to find that Dr. Abbey violated K.S.A. 65-1516(b)(5) by aiding or abetting the practice of optometry by an unlicensed entity, Stanton Optical or KPEG.*

The Board also found that Dr. Abbey violated K.S.A. 65-1516(b)(5) by "[a]iding or abetting the practice of optometry by an unlicensed entity, Stanton Optical and/or KPEG." Like the prior allegation, there is no erroneous interpretation of the law, the question is one of fact—is there substantial evidence that Dr. Abbey aided and abetted the unlicensed practice of optometry by KPEG or Stanton Optical.

Aiding and abetting, at least as the terms are commonly used, require an intent to achieve a specific result. See *State v. Gonzalez*, 311 Kan. 281, 291, 460 P.3d 348 (2020) (noting that to convict a defendant of a specific intent crime on an aiding and abetting theory, the State must prove that the defendant had the same specific intent to commit the crime as the principal). Stated another way, aiding and abetting requires:

> "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'" *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 936, 811 P.2d 1220 (1991) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 [D.C. Cir. 1983]).

Under the facts here, there is no evidence that Dr. Abbey had the intent to aid or abet KPEG or Stanton Optical in the unlicensed practice of optometry. Dr. Abbey testified that he relied on assurances that a legal team was involved to ensure compliance with Kansas laws and regulations. While he was aware of his own conduct, there are not

12

sufficient facts to support a finding that he was aware of his role as part of an illegal activity. Under these circumstances, there was insufficient evidence to support the Board's factual finding that Dr. Abbey violated K.S.A. 65-1516(b)(5).

C. *There was insufficient evidence to support the Board's finding that Dr. Abbey violated K.S.A. 65-1516(b)(18) through a business relationship or association with Stanton Optical.*

The Board then found that Dr. Abbey's business arrangement with Stanton Optical created the impression that Stanton Optical is engaged in the practice of optometry or that Dr. Abbey's practice is part of and in association with Stanton Optical's business. It cited K.S.A. 65-1516(b)(18) as the applicable provision it believed he violated. That subsection provides that it is unprofessional conduct to allow "improper interference with the licensee's professional judgment in providing care." K.S.A. 65-1516(b)(18).

First, Dr. Abbey had no relationship with Stanton Optical. His relationship was with KPEG, which the Board found constituted unprofessional conduct under K.S.A. 65-1516(b)(2).

Second, the Board specifically found that "Dr. Abbey's professional judgement was not affected and there was no indication from the evidence that any patients were harmed as a result of Dr. Abbey's conduct."

And third, the Board focuses, for this violation, on the fact that Dr. Abbey's business arrangement with Stanton Optical makes it appear that Stanton Optical is engaged in the practice of optometry. Yet, the Board specifically found that Dr. Abbey was not engaged in or using fraudulent or false advertising or that his conduct was intended to deceive, defraud, or harm the public.

13

So no evidence supports the Board's finding that Dr. Abbey violated K.S.A. 65-1516(b)(18) and in fact all of the Board's findings point the other way.

III.    THE BOARD FOUND Dr. ABBEY VIOLATED THREE RELEVANT REGULATIONS

After considering the statutes, the Board then addressed the relevant regulations.

A. *There was insufficient evidence for the Board to conclude that Dr. Abbey violated K.A.R. 65-10-1(c)(2) by maintaining an office or practice location as part of or in association with a business entity that is not licensed to practice optometry.*

The Board determined that Dr. Abbey's office arrangement with Stanton Optical violated K.A.R. 65-10-1(c)(2) because Stanton Optical was an unlicensed entity and that his association with KPEG, a medical practice, was an attempt to avoid some optometry regulations.

> "(c) No licensee shall maintain an office or practice location in a manner that indicates or implies either of the following.
>    . . . .
> "(2) The licensee's practice is being carried on as part of or in association with the business enterprise of the unlicensed person." K.A.R. 65-10-1(c)(2).

To fully understand the Board's reason for finding a violation of this regulation, we must look at its factual findings. The evidence most related to whether Dr. Abbey's practice was being carried on as part of or in association with the business enterprise of an unlicensed person includes:

(1) KPEG shares an address with the Legal Department of Stanton Optical.

14

(2) Outside signage identifies the business as Stanton Optical, with only a small sign on the entrance door identifying KPEG as a tenant within the building.

(3) A hallway from Stanton Optical's eyeware products area led to the "'clinical side'" which included a KPEG reception desk and waiting room.

(4) Google reviews reflected the belief that Stanton Optical and KPEG were operating as one.

(5) Advertising on the outside of Stanton Optical, suggesting a free eye exam, gave the perception that Stanton Optical or their employees were providing the free eye exam.

(6) In the upper left corner of the website there was a box to check to "'Book Eye Exam'" giving "'the perception that Stanton [Optical] and the optometrist at whatever location you would go to would be working together.'"

(7) The "Frequently asked Questions" for the Stanton Optical website included a disclaimer that "'Stanton Optical is not an eye care provider and does not provide eye examinations.'"

(8) Stanton Optical had a disclaimer at the practice location confirming the eye examinations were provided by KPEG.

(9) Appointments with KPEG could be scheduled by calling the number listed on the Stanton Optical website. After scheduling the appointment, the person thanked her "'for calling Stanton Optical to schedule [her] eye examination.'"

(10) Stanton Optical employees were trained to assist as technicians for KPEG as needed.

When reviewing all the evidence in the record, there is not substantial evidence to support a finding that Dr. Abbey "maintain[ed] an office or practice location in a manner

15

that indicates or implies . . . (2) [t]he licensee's practice is being carried on as part of or in association with the business enterprise of the unlicensed person." K.A.R. 65-10-1(c).

First, while KPEG's mailing address is listed with the State as Stanton Optical's legal department, that is not information that most individuals would know or care to know. Businesses have mailing addresses at locations other than the physical business for diverse reasons, and that does not automatically imply or indicate that business is being carried on as part of an enterprise with whatever is at the mailing address.

Next, while signage for Stanton Optical might have been the most prominent signage at the location, there were signs noting that KPEG was present in the building. By having separate signs, the businesses were making it clear that two entities were involved. At least one of the doors to enter the building made it clear that KPEG and Stanton Optical were separate businesses with different names and operating hours. Two of the doors to the building have only KPEG's hours listed and one of those doors appears to open to the glasses section of the building.

Third, while there was not complete physical separation between Stanton Optical and KPEG, there was at least some separation of the businesses. KPEG had its own distinct waiting area and reception desk. All witnesses agreed that there was a distinct area dedicated to eye exams.

Next, Google reviews seem of limited import. Public perception does not control whether a licensee is operating in a manner that violates optometry regulations, even though it may play a role in the determination. See K.A.R. 65-10-1(c) (licensee must avoid maintaining an office in a manner that "indicates or implies" impermissible conduct).

16

Fifth, Stanton Optical's website allowed the public to book eye examinations with KPEG and Dr. Abbey which does imply that Dr. Abbey's practice is part of Stanton Optical's business. But Stanton Optical's website also contained a disclaimer that it does not provide eye care or conduct eye examinations. A similar disclaimer stated that KPEG would perform the eye examinations. With the disclaimers available, any implication or indication that KPEG and Stanton Optical are part of the same business seems assuaged.

Sixth, while the phone call center answering the phone as "Stanton Optical" to schedule eye examinations with Dr. Abbey does make it look like they are the same business, the appearance would be alleviated by attending the scheduled examination. As stated above, the signs at the office location made it clear that Stanton Optical and KPEG were different businesses.

Finally, the fact that Stanton Optical employees would occasionally assist Dr. Abbey when he was short staffed is not enough to establish that Dr. Abbey was maintaining an office that conveyed or implied that his practice was part of Stanton Optical's business enterprise. The testimony was clear that such an arrangement was not in violation of any statute or regulation.

After considering all the relevant evidence, the Board failed to establish substantial competent evidence to support its decision that Dr. Abbey violated K.A.R. 65-10-1(c). While there were problematic aspects of Dr. Abbey and Stanton Optical's business arrangement, the problems were sufficiently alleviated by disclaimers and signage making it clear that Dr. Abbey and Stanton Optical were separate businesses and that Dr. Abbey's practice was not "being carried on as part of or in association with the business enterprise of the unlicensed person." See K.A.R. 65-10-1(c)(2).

17

B. *There was insufficient evidence to support the Board's finding that Dr. Abbey violated K.A.R. 65-10-2(b), K.A.R. 65-11-1(a), K.A.R. 65-11-2(g), or K.A.R. 65-11-3 by acquiescing in advertising that implied that Dr. Abbey was practicing in association with Stanton Optical, an entity that is not licensed to practice optometry.*

First the Board determined that Dr. Abbey violated K.A.R. 65-10-2(b) because "[t]he advertising by Stanton [O]ptical implied Dr. Abbey was practicing in association with Stanton Optical, an entity that is not licensed to practice optometry."

> "[A]n unlicensed person shall be deemed to be maintaining an office for the practice of optometry if . . . (b) [t]he licensee's office, location, or place of practice indicates or implies, by . . . advertising, or otherwise, that the licensee is practicing as a part of or in association with the business of an unlicensed person." K.A.R. 65-10-2(b)

The Board also determined that Dr. Abbey violated K.A.R. 65-11-2(g) which prohibits advertisements from indicating or implying "that the licensee is engaged in or maintains an office for the practice of optometry as part of, or in association with, the business or operation of an unlicensed person or entity" except as otherwise authorized by law. It should also be noted that K.A.R. 65-11-2 lists what advertisements are considered fraudulent. But the Board specifically found that "the evidence had not proven Dr. Abbey was engaged in or using fraudulent or false advertising." The Board's determination that Dr. Abbey violated K.A.R. 65-11-2 was contradicted by its own finding.

Finally, the Board determined that Dr. Abbey violated K.A.R. 65-11-3 because KPEG had not placed its own disclaimer signage after Stanton Optical placed disclaimers in the Spring of 2021. Under K.A.R. 65-11-3,

18

"all signs, advertising, and displays of any licensee shall be separate and distinct from those of any other person, firm, or corporation and shall not in any way suggest that the licensee is associated with any other person, firm, or corporation with which the licensee is not associated."

The Board concluded that Dr. Abbey was responsible "for any advertising which is designed to benefit the licensee, directly or indirectly, whether or not the licensee authored it or caused it to be published." K.A.R. 65-11-1(a).

The Board reads too much into K.A.R. 65-11-3. The Board acknowledged that Stanton Optical had placed signs with disclaimer language but noted that "KPEG had not placed the same signage, furthering the implication that Dr. Abbey was associated with an unlicensed entity in providing optometry services" which, in the Board's view, was a violation of K.A.R. 65-11-3. But K.A.R. 65-11-3 does not require a licensee to place disclaimer language themselves, it merely requires separate and distinct advertisements that do not incorrectly suggest that the licensee is associated with a person, firm, or corporation. There is no affirmative duty for the licensee to post their own disclaimers. Stanton Optical's disclaimers were enough to remedy any incorrect implications. See K.A.R. 65-11-3.

In other words, the Board's decision largely ignores that Stanton Optical placed disclaimers up, before the administrative hearing on this matter, which would eliminate any potential confusion caused by their signage. Additional disclaimers were present on Stanton Optical's website. Moreover, the practice location had signs indicating that KPEG and Stanton Optical were separate businesses. Any implication from Stanton Optical's advertisements was alleviated by the disclaimers and separate signs on the building.

19

After considering all the relevant evidence, there was insufficient evidence to support the Board's determination that Dr. Abbey violated K.A.R. 65-10-2(b), K.A.R. 65-11-2(g), or K.A.R. 65-11-3. While the initial signage could have created impermissible implications, once Stanton Optical included the disclaimers the problem was alleviated. Any decision by the Board which imposed an affirmative duty, through K.A.R. 65-11-3, on Dr. Abbey or KPEG to do the same was an error of law.

C. *There was insufficient evidence to support the Board's finding that Dr. Abbey violated K.A.R. 65-10-3 by operating in such a way that there was no physical separation between Stanton Optical and KPEG.*

The Board also determined that Dr. Abbey violated K.A.R. 65-10-3 because "Stanton Optical and KPEG were not physically separated." Under K.A.R. 65-10-3(a), if a licensee has a beneficial interest in a business marketing ophthalmic goods the licensee must have the business "separate and apart" from the office providing optometric services. K.A.R. 65-10-3(b) defines separate and apart as: "(1) being physically separated; and (2) the totally independent functioning of the franchise business of optical dispensing and any optometric office or practice location."

The Board acknowledged that Dr. Abbey provided several examples of side-by-side practices which Dr. Abbey believed operated much like KPEG and Stanton Optical. But the Board noted that the examples "all involved a door separating the optometric practice from the ophthalmic goods practice" and that there "was no such separation between Stanton Optical and KPEG."

On appeal, the Board does not make any arguments specific to this regulation. Instead, the Board makes occasional reference to the side-by-side relationship between KPEG and Stanton Optical throughout its other arguments. For his part, Dr. Abbey

20

argues that K.A.R. 65-10-3 does not apply to him and, even if it does, he did not violate the regulation.

This court can consider what K.A.R. 65-10-3 requires without giving any deference to the Board's view or interpretation of the regulation. See *Hanson*, 313 Kan. at 762. Dr. Abbey argues that K.A.R. 65-10-3(a) does not apply to him because he has no beneficial relationship with Stanton Optical. Dr. Abbey could be said to have a beneficial relationship with Stanton Optical given the nature and location of his practice, but we need not address the issue. As noted above, the Board did not discuss the issue in its brief and, even if K.A.R. 65-10-3(a) applies to Dr. Abbey, he did not violate the regulation.

The plain language of K.A.R. 65-10-3 requires an optometrist's office to be physically separated from a business selling glasses. The regulation does not require floor to ceiling physical barriers such as walls and doors separating the businesses. While that may be the industry standard, under the plain language of the regulation it is not required. And several witnesses acknowledged as much. If the Board wants to require walls and doors separating the businesses it can do so through an amendment to the regulations, but as it is now, the Board erroneously interpreted K.A.R. 65-10-3 to require more than it does.

With that said, there was insufficient evidence to support a finding that Dr. Abbey was practicing in violation of K.A.R. 65-10-3. While there was no wall or door between Stanton Optical and Dr. Abbey's practice, the two businesses were physically separated. As Sparks testified, the two portions of the building were connected by a hallway. And Dr. Abbey's practice had its own waiting area and reception desk. There was enough physical separation, as required by K.A.R. 65-10-3, between Dr. Abbey's practice and Stanton Optical. The Board erred by finding that Dr. Abbey violated the regulation.

21

In sum, we find that the evidence and the law support the Board's finding that Dr. Abbey engaged in the practice of optometry as an agent or employee of KPEG. KPEG was not licensed under the optometry law and Dr. Abbey's practice was not ancillary to Dr. Parsons' medical practice under these facts. We find that there was insufficient evidence to support any of the other alleged statutory or regulatory violations found by the Board.

IV.    THE REASONABLENESS OF THE BOARD'S DISCIPLINE IS EXAMINED

Finally, Dr. Abbey argues that the discipline imposed by the Board was unreasonable, arbitrary, and capricious. Dr. Abbey presented evidence that similar violations by optometrists had resulted in fines only, and no suspension. And he argues that the provision that limits his future employment to an employer that is not in violation of the Kansas Optometry Act is vague and ambiguous. He pointed out throughout the hearing, through counsel's questioning of the witnesses, that the Board had full authority to take action against what would appear to be the bigger actors here, KPEG and Stanton Optical, but chose instead to act against an optometrist who was relying on the advice of counsel and had no authority over either of the other two entities—an optometrist who was duly licensed to practice optometry and had no allegations of inappropriate patient care.

What entities the Board chooses to pursue is fully within its discretion. And the Board reasonably counters that disciplinary actions against other optometrists even in similar circumstances are irrelevant, particularly when the examples put forward by Dr. Abbey involved agreed upon resolutions, not findings after a full hearing.

It is undisputed that the discipline imposed by the Board was within its statutory authority. It is also undisputed that the Board imposed a more severe penalty because Dr. Abbey had been subject to discipline in the past, including a revocation of his license for

22

about four years. Dr. Abbey argues that the violations that resulted in the revocation of his license were totally different than those before the Board currently. In addition, he points out the Board found it appropriate to reinstate his license in 2017. Yet, there was some testimony before the Board that could support a finding that there were similarities between the two offenses.

But enhancing penalties based on prior conduct, even though dissimilar, does not require a conclusion that the action was unreasonable, arbitrary, and capricious. In attorney disciplinary cases, for example, prior sanctions are a recognized aggravating factor, even though there could be some mitigation based on similarity and remoteness. See *In re Thurston*, 304 Kan. 146, 150, 371 P.3d 879 (2016).

That said, we do find it necessary to remand this case to the Board to examine the discipline imposed because this court has found only one violation to be supported by the facts and the law. We express no opinion on the appropriate discipline, only that it should be re-examined given this court's ruling.

The case is remanded to the Board to consider the appropriate discipline to be imposed.

Affirmed in part, reversed in part, and remanded with directions.